### ` HUIDEKOPER'S Lessee *v.* DOUGLASS. (*a*)

#### *Land titles in Pennsylvania.—Holland Land Company.*

Under the act of Pennsylvania, of 3d April 1792, for the sale of the vacant lands, &c., the gran-
tee, by warrant, of a tract of land, lying north and west of the rivers Ohio and Allegheny, and
Conewango creek, who by force of arms of the enemies of the United States, was prevent-
ed from settling and improving the said land, for the space of two years from the date of his
warrant, but during that time, persisted in his endeavors to make such settlement and im-
provement, is excused from making such actual settlement as is described in the ninth section
of the act, and the warrant vests in such grantee a fee-simple.

THIS was a case certified from the Circuit Court of the United States, for
the district of Pennsylvania, in which the opinions of the judges of that court
were opposed.

The action was an ejectment to try the title of the "Holland Company"
to a very large tract of land in Pennsylvania, lying north and west of the
rivers Ohio and Allegheny, and Conewango creek, purchased of that state,
under the act of assembly of the 3d of April 1792 (3 Dall. Laws 209), which
act is as follows, viz :

An act for the sale of the vacant lands within this commonwealth.

Whereas, the most valuable lands within the commonwealth, included
within the purchase made from the native Indians, in the year 1768, have
been taken up, located and appropriated *for the use of divers pur-   [*2
chasers, at prices heretofore established by law, and those which re-
main unsold and unsettled, being inferior in quality or situation, cannot be
sold at the same prices : And whereas, the prices fixed by law for other lands

---

(*a*) Present, MARSHALL, Ch. J., CUSHING, PATERSON, WASHINGTON and JOHNSON, Jus-
tices.

3 CRANCH—1                                                                    1

Huidekoper v. Douglass.

belonging to the commonwealth are found to be so high as to discourage actual settlers from purchasing and improving the same :

§ 1. That from and after the passing of this act, the price of all the vacant lands within the limits of the purchase made of the Indians in the year 1768, and all preceding purchases, excepting always such lands as have been previously settled upon or improved, shall be reduced to the sum of fifty shillings for every hundred acres ; and the price of vacant lands within the limits of the purchase made of the Indians, in the year 1784, and lying east of Allegheny river and Conewango creek, shall be reduced to the sum of five pounds for every hundred acres thereof ; and the same shall and may be granted to any person or persons applying for the same, at the price aforesaid, in the manner and form accustomed under the laws heretofore enacted and now in force.

§ 2. That from and after the passing of this act, all other lands belonging to this commonwealth, and within the jurisdiction thereof, and laying north and west of the rivers Ohio and Allegheny, and Conewango creek, excepting such parts thereof as heretofore have been, or hereafter shall be, appropriated to any public or charitable use, shall be and are hereby offered for sale to persons who will cultivate, improve and settle the same, or cause the same to be cultivated, improved and settled, at and for the price of seven pounds, ten shillings, for every hundred acres thereof, with an allowance of six per centum for roads and highways, to be located, surveyed and secured to such purchasers in the manner hereinafter mentioned.

*3]    *§ 3. That upon the application of any person who may have settled and improved, or is desirous to settle and improve, a plantation, within the limits aforesaid, to the secretary of the land-office, which application shall contain a particular description of the lands applied for, there shall be granted to him a warrant for any quantity of land within the said limits, not exceeding four hundred acres, requiring the surveyor-general to cause the same to be surveyed for the use of the grantee, his heirs and assigns for ever, and make return thereof to the surveyor-general's office, within the term of six months next following, the grantee paying the purchase-money, and all the usual fees of the land-office.

§ 4. That the surveyor-general shall, with the approbation of the governor, divide the lands thus offered for sale, into proper and convenient districts, in such manner as he may think expedient, so that the boundaries of each district, either natural or artificial, may be known, and appoint one deputy-surveyor for each district, who shall give bond and security, as is customary with other deputy-surveyors in this commonwealth, and shall reside within, or as near as possible, to his respective district ; and every such deputy-surveyor shall, within sixty days next after his appointment, certify to the surveyor-general, the county, township and place, where such deputy-surveyor shall keep his office open, for the purpose of receiving warrants, in order that all persons who may apply for lands as aforesaid, may be duly informed thereof ; and every deputy-surveyor who shall receive any such warrant, shall make fair and clear entries thereof in a book, to be provided by him for that purpose, distinguishing therein the name of the person therein mentioned, the quantity of land, date thereof, and the day on which such deputy-surveyor shall receive the same, which book shall be open, at all seasonable hours, to every applicant, who shall be entitled to copies of any

*Huidekoper v. Douglass.*

entries therein, to be certified as such, and signed by the deputy-surveyor, the party paying one-quarter of a dollar therefor.

*§ 5. That the deputy-surveyor shall, at the reasonable request [*4 and proper cost and charges of the respective grantees, in such warrants named, proceed to survey the lands in such warrants described, as nearly as may be, according to the respective priorities of their warrants; provided, that they shall not, by virtue of any warrant, survey any tract of land, that may have been actually settled and improved, prior to the date of the entry of such warrant with the deputy-surveyor of the district, except for the owner of such settlement and improvement; and having perfected such surveys, shall enter the same in a book, to be kept by the deputy-surveyor, and to be called the survey-book; and the same book shall remain in his office, liable to be inspected by any person whatsoever who shall demand to see the same, upon the payment of eleven pence for every search; and the deputy-surveyor shall cause copies of any such survey to be made out and delivered to any person, upon the payment of one-quarter of a dollar for each copy.

§ 6. That in making any survey by any deputy-surveyor, he shall not go out of his proper district to perform the same, and that every survey made by any deputy-surveyor, without his proper district, shall be void and of non effect. And the surveyor-general and his deputies, are hereby severally directed and enjoined to survey, or cause to be surveyed, the full amount of land contained and mentioned in any warrant, in one entire tract, if the same can be found, in such manner and form, as that such tract shall not contain in front on any navigable river or lake, more than one-half of the length or depth of such tract, and to conform the lines of every survey, in such manner as to form the figure or plot thereof, as nearly as circumstances will admit, to an oblong, whose length shall not be greater than twice the breadth thereof; and in case any such survey should be found to contain a greater quantity of land than is mentioned in the warrant on which it shall be made, so that such excess be not more than one-tenth of the number of acres mentioned in such warrant, besides the usual allowance for roads and highways, the return thereof shall, nevertheless, be *admitted under [*5 the warrant, provided, the party procuring such return to be made, shall forthwith pay to the receiver-general of the land-office, the price or value of such excess or overplus land, at the same rate at which he paid for the land mentioned in the warrant.

§ 7. That every deputy-surveyor, to be appointed by virtue of this act, shall, within the month of February in the next year, make and return into the office of the surveyor-general, plots of every survey which he shall have made in pursuance of any warrant, connected together in one general draft, so far as they may be contiguous to each other, with the courses and distances of each line, the quantity of land contained in each survey, and the name of the person for whom the same was surveyed; and every succeeding year, he shall make a like return of the surveys made in the year preceding.

§ 8. That the deputy-surveyor of the proper district shall, upon the application of any person who has made an actual settlement and improvement on lands, lying north and west of the rivers Ohio and Allegheny and Conewango creek, and upon such person paying the legal fees, survey and

mark out the lines of the tract of land to which such person may, by con-
forming to the provisions of this act, become entitled by virtue of such
settlement and improvement : provided, that he shall not survey more than
four hundred acres for such person, and shall, in making such survey, con-
form himself to all the other regulations by this act prescribed.

§ 9. That no warrant or survey, to be issued or made in pursuance of
this act, for lands lying north and west of the rivers Ohio and Allegheny
and Conewango creek, shall vest any title in or to the lands therein men-
tioned, unless the grantee has, prior to the date of such warrant, made, or
caused to be made, or shall, within the space of two years next after the
date of the same, make, or cause to be made, an actual settlement thereon, by
clearing, fencing and cultivating, at least two acres for every hundred acres
contained in one survey, erecting thereon a messuage for the habitation of
man, and *residing, or causing a family to reside thereon, for the
space of five years next following his first settling of the same, if he
or she shall so long live ; and that in default of such actual settlement and
residence, it shall and may be lawful to and for this commonwealth, to issue
new warrants to other actual settlers for the said lands, or any part thereof,
reciting the original warrants, and that actual settlements and residence
have not been made in pursuance thereof, and so often as defaults shall be
made, for the time and in the manner aforesaid, which new grants shall be
under and subject to all and every the regulations contained in this act :
Provided always, nevertheless, that *if any such actual settler, or any
grantee, in any such original or succeeding warrant, shall, by force of arms
of the enemies of the United States, be prevented from making such actual
settlement, or be driven therefrom, and shall persist in his endeavors to make
such actual settlement as aforesaid, then, in either case, he and his heirs
shall be entitled to have and to hold the said lands, in the same manner as if
the actual settlement had been made and continued.*

§ 10. That the lands actually settled and improved according to the pro-
visions of this act, to whosesoever possession they may descend or come,
shall be and remain liable and chargeable for the payment of the considera-
tion or purchase-money at the rate aforesaid, for every hundred acres, and
the interest thereon, accruing from the dates of such improvements ; and if
such actual settler, not being hindered as aforesaid, by death, or the enemies
of the United States, shall neglect to apply for a warrant, for the space
of ten years after the time of passing this act, it shall and may be
lawful to and for this commonwealth to grant the same lands, or any part
thereof, to other, by warrants, reciting such defaults ; and the grantees,
complying with the regulations of this act, shall have, hold and enjoy the
same, to them, their heirs and assigns ; but no warrant shall be issued in
pursuance of this act, until the purchase-money shall be paid to the
receiver-general of the land-office.

§ 11. That when any *caveat* is determined by the *board of prop-
erty, in manner heretofore used in this commonwealth, the patent
shall, nevertheless, be stayed for the term of six months, within which time,
the party against whom the determination of the board is, may enter his suit
at common law, but not afterwards ; and the party in whose favor the de-
termination of the board is, shall be deemed and taken to be in possession,
to all the intents and purposes of trying the title, although the other party

should be in actual possession, which supposed possession, shall, nevertheless, have no effect upon the title ; at the end of which term of six months afore-said, if no suit is entered, a patent shall issue, according to the determination of the board, upon the applicant producing a certificate of the prothonotary of the proper county, that no suit is commenced, or if a suit is entered, a patent shall, at the determination of such suit, issue, in common form, to that party in whom the title is found by law ; and in both cases, the patent shall be and remain a full and perfect title to the lands, against all parties and privies to the said *caveat* or suit ; saving, nevertheless, to infants, *femes covert*, persons beyond sea, *non compotes mentes*, and others under disabilities, their respective rights, until twelve months after such disabilities are removed.

§ 12. That no direct taxes shall be levied, assessed or collected, for the use of this commonwealth, upon or from any of the lands or tenements lying north or west of the purchase made of the Indians, in the year 1768, or the personal estate found thereupon, for the full space or term of ten years, from and after the passing of this act.

§ 13. That the following tracts of land shall be reserved for the use of the commonwealth, that is to say, at Presqu' Isle, formed by Lake Erie, the island or peninsula which forms the harbor, and a tract extending eight miles along the shore of the lake, and three miles in breadth, so as to include the tract already surveyed by virtue of a resolution of the general assembly, and the whole of the harbor formed by the said Presqu' Isle, at the mouth of Harbor creek, which empties into the *Lake Erie, and along the shore of the lake, on both sides of said creeek, two thousand acres.                [*8

§ 14. That all the lands within the triangle on Lake Erie, purchased from the United States, shall be taken and deemed, and they are hereby declared to be, within the limits of the county of Allegheny.

§ 15. That it shall and may be lawful to and for the holder and holders of any unsatisfied warrant or warrants, heretofore issued for lands, agreeably to the 7th section of the act, entitled " an act to alter and amend an act of assembly, entitled an act for opening the land office, for granting and disposing of the unappropriated lands within this state," passed on the 21st day of December, in the year 1784, to locate the quantity of land for which such unsatisfied warrant and warrants was and were granted, in any district of vacant and unappropriated land within this commonwealth ; provided, the owner or owners of such unsatisfied warrants shall be under the same regulations and restrictions, as other owners of warrants taken for lands lying north and west of the Allegheny river and Conewango creek, are made subject by this act, the said recited act, or any other act or acts of the general assembly, to the contrary thereof in anywise notwithstanding.

The points upon which the opinions of the judges of the court below were opposed, were certified to be as follows, viz :

1. Whether, under the act of the legislature of Pennsylvania, passed on the 3d day of April, 1792, *entitled " an act for the sale of the vacant lands within this commonwealth," the grantee, by warrant of a tract        [*9 of land lying north and west of the rivers Ohio and Allegheny and Conewango creek, who, by force of arms of the enemies of the United States, was prevented from settling and improving the said land, and from residing

thereon from the 10th day of April 1793, the date of the said warrant, until the 1st day of January 1796, but who, during the said period, persisted in his endeavors to make such settlement and residence, is excused from making such actual settlement, as the enacting clause of the 9th section of the said law prescribes, to vest a title in the said grantee?

2d. Whether a warrant for a tract of land lying north and west of the rivers Ohio and Allegheny and Conewango creek, granted in the year 1793, under and by virtue of the act of the legislature of Pennsylvania, entitled "an act for the sale of the vacant lands within this commonwealth," to a person who, by force of arms of the enemies of the United States, was prevented from settling and improving the said land, and from residing thereon from the date of the said warrant until the 1st day of January 1796, but, who during the said period, persisted in his endeavors to make such settlement and residence, vests any, and if any, what title, in or to the said land, unless the said grantee shall, after the said prevention ceases, commence, and within the space of two years thereafter, clear, fence and cultivate at least two acres for every hundred acres contained in his said survey, erect thereon a messuage for the habitation of man, and reside, or cause a family to reside thereon, for the space of five years next following his first settling the same, the said grantee being yet in full life?

3d. Whether a grantee in such a warrant as aforesaid, who has failed to make such settlement as the enacting clause of the said 9th section requires, and who is not within the benefit of the proviso, has thereby forfeited his right and title to the said land, until the commonwealth has *taken advantage of the said forfeiture, so as to prevent the said grantee from recovering the possession of said land, in ejectment against a person, who, at any time after two years from the time the prevention ceased, or at any subsequent period, has settled and improved the said land, and has ever since been in possession of the same?

*Dallas*, for the plaintiff, contended for three general propositions.

1. That a warrantee (meaning thereby a person claiming under a warrant from the commonwealth) who has been prevented, by force of arms of the enemies of the United States, from improving, settling and residing on the land, but has persisted in his endeavors to do so, during two years from the date of his warrant, is forever and totally released, by the operation of the proviso, from the obligation of making the improvement, settlement and residence described in the enacting clause of the 9th section of the law.

2. If not for ever and totally excused, under the specified circumstances, yet the warrant vests in such warrantee and his heirs, a title to the land under one of three aspects: 1st. Provided, during and for a reasonable time after the period of prevention, he persists in his endeavors to accomplish an improvement, settlement and residence, although his endeavors should not be successful: 2d. Provided he accomplishes the settlement and improvement, within two years, and the residence within five years, after the prevention by hostilities ceased: 3d. Provided he has accomplished the improvement, settlement and residence, at any time before the commonwealth has taken advantage of the forfeiture.

3. The inceptive title of the warrantee gives a right of possession, which

Huidekoper v. Douglass.

can only be defeated by an act of the commonwealth, taking advantage of a forfeiture for non-compliance with the terms of the grant.

I. In order to understand the act of 1792, it will be necessary to take a view of the situation of the state of *Pennsylvania at that period. [*11 Her finances were embarrassed, and an Indian war existed on her frontiers. Hence, she had two great objects in view, the protection of those frontiers, and the accession of wealth to her treasury. To accomplish the first, no means were so sure as to establish on the frontiers a firm, hardy and vigilant population, bound by their dearest interests to watch and repel the predatory incursions of the Indians. And to attain the second, no means presented themselves so obviously as the sale of the vacant lands.

Although the war was raging, at the time when the act passed, yet negotiations were pending, and peace was expected. The general provisions of the act, therefore, especially those which relate to settlement and residence, are predicated upon a state of peace, while the legislature also took care to provide for a state of war.

The extent of that provision is the principal subject of litigation. Without resorting to the words, but considering the law as a contract, what are the motives and ideas which may be reasonably ascribed to the parties?

1st. As to the state. 1. The settlement might be prevented by two means; public calamity, or negligence in the grantee. For the one, it was just that the state should answer; for the other, the grantee. 2. It was unreasonable, for the state to require the same from him who should be prevented, as from him who should not be prevented from making a settlement. A mere enlargement of time, diminishes, but does not obviate the objection. It does not put both on an equal footing. The man who has spent years in fighting and toiling to obtain a settlement, is still to do just as much as the man who has stayed at home by his fire-side till war is over, and then purchases his warrant. The former has no credit for his toil and wounds. This construction is evidently contrary to the spirit of the act, which was to *gain hardy adventurers, who should join their exer- [*12 tions to those of the state and of the United States, to subdue the Indians; for it totally destroys all motive for such exertions. The state, therefore, might say, and, without doubt, meant to say, to the war warrantee, that a persistence in the endeavor to settle, during the period prescribed, shall be accepted in lieu of actual settlement. That the man who has actually accomplished the settlement and residence, in time of peace, and he who shall have persisted in his endeavors to settle and reside for the stipulated time, during a state of war, but who has been prevented by the enemy from accomplishing his settlement and residence, are equally meritorious, and shall be put on the same footing.

2d. As to the warrantee. Would he purchase, during the war, if he was liable to forfeit his warrant although he persists during the limited time, and if all his expenses and dangers were to go for nothing, and if, at the end of the war, he would be in the same situation as if he had remained at home?

The situation of the state, then, called for money, population and improvement. The means were a sale of the land, subject to settlement, if not prevented by a public calamity. The words and spirit of the act are conformable to these ideas. The title is, for the sale of vacant lands. The

Huidekoper v. Douglass.

preamble states, that the prices at which they have been heretofore held were found so high as to discourage actual settlers from purchasing and improving. The second and third sections contain the offer of the lands for sale, and the ninth describes the terms.

On this overture, companies and individuals became purchasers. Among the rest, the Holland Company, in April 1792, and August 1793, purchased *13] 1162 tracts of 400 acres each, which, by losses upon re-surveys, *and bounties to actual settlers, are reduced to 776 tracts, which have cost the company $222,071.10 for purchase-money, and (up to the year 1802) $202,000 in expenses, endeavors to settle, and actual improvements. The Population Company also expended nearly the same amount. The consequence was, that the public treasury was supplied ; a bank was established, which furnishes revenues adequate to the whole expenses of the government, so that no taxes have been since imposed ; industry and improvements have been stimulated, and the state has advanced rapidly in wealth and prosperity. The persistence and prevention of the Holland company are admitted.

The treaty made with the Indians in 1795, is considered as the epoch from which the two and the five years mentioned in the 9th section begin to run. But there was still further prevention by distance, by the season (for the treaty was ratified in the winter), by intruders (who were pushing in upon the lands, under pretence that the warrants were forfeited by want of settlement within the two years), and by the construction of the act given by the board of property. How, then, are the terms of the contract to be expounded ? Not by the words (for they are inconclusive and repugnant), but by the nature of the transaction. By the 3d section, a fee-simple is granted; but the 9th section annexes a condition precedent. The warrant shall not vest any title " unless," &c.

The nature of the transaction, however, gives a possessory title, and an usufructuary property, at least, for the two and the five years, else the warrantee could not go and make a settlement. It is always spoken of in the act as a grant. It may be devised, sold, descend, be taken in execution, &c. By the 9th section, what is given can only be divested by default. The whole estate does not remain in the grantor, until performance of the condition.

*14] *But the settlement and residence for the time mentioned, is not a sine qua non to vest an absolute title. There are cases within the 9th section, in which the title becomes absolute, although the residence shall not have been completed. The words of the act are, "reside thereon for the space of five years next following his first settling of the same, if he shall so long live." If the warrantee, having begun his settlement, should die, before the expiration of the five years, his title is complete. So, if he puts a family on the land to reside, and dies before the end of the term, and the family quits its residence before the expiration of the five years, the title is absolute. So, if an actual settler shall, by force of arms of the enemies of the United States, be driven from his settlement. And so (as we say), " if any grantee shall," by like force, " be prevented from making an actual settlement, and shall persist in his endeavors to make such actual settlement," during the time allowed for making the same, that is, for two years, " he and his heirs shall be entitled to have and to hold the said lands, in the same

Huidekoper v. Douglass.

manner as if the actual settlement had been made and continued." In each of these cases, the condition is released. If the legislature meant anything less, words were not wanting in which to express their ideas, and here was an opportunity of using them.

The particular words of the proviso are important. "If any grantee shall be prevented :" this implies an attempt and failure : "and shall persist," implying still the want of success : "in his endeavors ;" still holding up the idea that the thing is not accomplished; "to make," not, until he make, not persist to make, but persist in his endeavors to make, implying a continued attempt, not a performance. "Shall be entitled to have and to hold, in the same manner *as if.*" Here the words *as if*, necessarily imply that the thing itself is not done. The first part of the section gives the lands, if the thing is done, but the proviso also gives it, in a certain case, if it be not done, in the same manner as if it had been done. They who contend that the persistence must continue, until the object is accomplished, make the legislature speak this absurd language : persist until *the settlement has been made, and you shall have the land in the same manner as if the set- [*15 tlement had been made. But we make them speak much more rationally. If you are prevented by the enemy from making the settlement, but persist in your endeavors for two years, you shall have the land, in the same manner as if the settlement had been made. We will take your endeavors for success. If settlement and residence were necessary, in all cases, the proviso is useless. If the legislature meant, by the proviso, only to extend the time, they have been very unfortunate in their language, for there is no expression which indicates such an idea, and it is contradicted by the preceding part of the section, by which the commonwealth reserve the right to grant new warrants as often as defaults shall be made, *for the time,* and in the manner aforesaid. No time is expressed in the act, but the two and the five years. If the time is to be enlarged, who shall say, how long ? There is no provision for trying by a jury the question, what is a reasonable time.

The act contemplates but two cases. An actual settlement, within the time, or a prevention, during the time, by the act of God, or of the public enemy. In both cases, the title was to be absolute. The same reason that releases the warrantee who dies, applies more strongly to the warrantee prevented by the enemy, and the 10th section puts them both on the same footing.

Let us consider what is required by the 9th section, and what is relinquished by the proviso? 1. It requires, within two years, a settlement, by clearing two acres for every hundred, by erecting a habitation and by residing five years. Here is evidently a confusion of terms, by requiring a settlement, consisting of five years' residence, to be accomplished in two years. *There are also other absurdities in the same section, equally glaring. [*16 Thus, it is declared, that in default of such actual settlement, the commonwealth may issue new warrants to other actual settlers; and that if such actual settler shall be prevented from making such actual settlement, he shall be entitled in the same manner as if the actual settlement had been made.

2. What is relinquished. The condition of residence is released by the death of the warrantee, and prevention releases both residence and settlement. The enacting part of the section may be considered as a covenant to settle ; and the proviso as a covenant to convey in case of prevention.

Huidekoper v. Douglass.

II. If persistence for two years does not for ever and totally release the condition of settlement, yet the warrant vests a title, under one of three aspects.

1st. Provided, during and for a reasonable time after the period of prevention, he persists in his endeavors to accomplish an improvement, settlement and residence, although his endeavors should not be successful.

To suppose the title to be forfeited, although an accomplishment of the condition has been prevented by the enemy, is to make the proviso of no use whatever. But giving a use to the proviso, and supposing it to mean an extension of time, everything is at sea. Every case would have a different rule, and decisions would vary with every jury. No case could be decided without a lawsuit. But if you allow the warrantee to gain a title by persisting, during the war, and for a reasonable time after, although without success, you render the law intelligible, and give effect to every part. *This construction comports with the peculiar expressions of the act, and is justified by the nature and equity of the case.

Endeavors during war would be more expensive than success in time of peace, and equally beneficial to the state. By this means also, you put the war-warrantee and the peace-warrantee upon an equal footing. But the legislature fixed a positive period, and left nothing to discretion. Who shall change the nature of the contract? Who give discretion to courts and juries? Who substitute endeavor for performance, in reference to any other time than the legislature contemplated?

2d. The second aspect is, provided he persists, after the war, and accomplishes the improvement in two years, and continues the residence for five years from the cessation of the prevention.

This is what is contended for on the other side, but this is not the express contract which fixes the time, as well as the acts which are to be done. It is not a contract which can be implied; for an undertaking to act in two years from the date of the warrant, does not imply an undertaking to act in two years after a war, which may be fifty years from the date of the warrant. The proviso contemplates no new act, no new epoch, but under the specified circumstances gives a title as if the act had been done in the time prescribed. This construction would make the proviso a mere mockery. It would place the warrantee, who had toiled through the dangers of the war, at a heavy expense, in no better situation than if he had used no exertions at all.

3d. The third aspect is, provided he persists during and after the war, and perform the conditions at any *time before the commonwealth takes advantage of the forfeiture.

This regards the case as a condition subsequent, the estate continuing after the contingency, until the grantor enters and claims. But this is contrary to the words, which call for endeavors, not performance. This construction destroys all limitation of time.

Upon the whole, there is no clear, safe, equitable and satisfactory construction, but that which supposes the condition to be released by the impossibility of performance within the time prescribed.

III. The inceptive title of the warrantee gives a right of possession, which can only be defeated by an act of the state.

All forfeitures are to be construed strictly. And where compensation

Huidekoper v. Douglass.

can be made, they are never enforced in equity. The forfeiture claimed is entitled to no favor. The contract itself was ambiguous, and rendered more so by official misinterpretations. The price has been paid. Time, labor and money have been expended in improvements, and attempts to settle. The prevention has been by a public calamity, not by private negligence. The operation of the forfeiture is dishonorable to the state. She seizes the land with all their amelioration, to sell them again to a stranger. Even the state herself, therefore, ought not to be countenanced in taking advantage of the forfeiture.

*But what pretext can justify a stranger in intruding upon the [*19 possession of the warrantee? This is the case of a trespasser, who thrusts himself in upon the land, pretending that the warrantee has forfeited his title. Is every person, who chooses to intrude, to be the judge whether the possessor has forfeited his title? This would encourage forcible entries and riots; riot would grow to rebellion. The peace of the commonwealth is at stake. No man can acquire a title by his own tort.

But turn to the words of the act. "That in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth to issue new warrants to other actual settlers, for the said lands, or any part thereof, reciting the original warrants, and that actual settlements and residence have not been made in pursuance thereof," &c. There must be proof of default; the party must be heard. The commonwealth *may*, not *shall*, grant new warrants.

It is said, however, that they are to be issued to other actual settlers; which gives a right to any person to enter on a forfeiture. The terms of the act, as well as the nature of the transaction, show that the case of a warrantee, and not a mere settler, is meant. It supposes a new warrant, where an old one had issued. Actual settler, is a *descriptio personæ*. It does not mean a man who has completed, but who contemplates, an actual settlement. This appears from the manner in which the terms actual settler are used in the preamble, *and in the 5th, 8th and 10th sections [*20 of the act, and even in the 9th section itself.

The commonwealth may grant new warrants to other actual settlers. Other than whom? Other than the actual settlers who had failed to make an actual settlement in the manner described in the beginning of that section. It means a person who had purchased with an intention, or under a stipulation, to make an actual settlement. There is no express authority given to any person to enter on a warrantee. Can it be implied, by saying that the state may grant to another actual settler? Her act must constitute the forfeiture of the old title : her act must grant the new.

*E. Tilghman*, on the same side, confined his argument principally to the support of the proposition, that a persistence for two years, after the date of the warrant, and in time of war, in endeavors to make a settlement, gave the same title as if the actual settlement had been made and continued.

He contended, that revenue and population were equally the objects of the legislature in passing the act. It ought not, therefore, to be construed with a sole view to population. The act, like a will, ought to be so construed as to carry into effect th   intention of the legislature, and to give operation to all its parts.

Huidekoper v. Douglass.

To understand the true meaning of the proviso of the 9th section, it is necessary to distinguish between settlement and residence. The warrantee is, by the first part of the section, to make a settlement, "by clearing, fencing and cultivating at least two acres for every hundred, and by *erecting thereon a messuage for the habitation of man." Thus much was to be done in two years, and this may with propriety be called "actual settlement." But this alone was not sufficient to give a title. The party must also "reside, or cause a family to reside, thereon, five years next following his first settling of the same, if he shall so long live." Residence is superadded to settlement, which is the principal requisite.

It is absurd to say, that residence is comprehended in settlement, because settlement must be within two years from the date of the warrant ; but the residence is to continue five years following the first settlement. The smaller number (2) cannot include the larger number (5), which must be the case, if residence is a part of settlement. It certainly is not. But it is a requisite additional to settlement, and which must be complied with, to complete the title. Settlement may be begun and completed in the last three months of the two years. Residence, the other requisite, is to commence with the inception of the settlement, and to continue five years, unless the party die : so that settlement is one thing, and residence another. Unless they are different, how can the one commence from the other ? If residence be a part of settlement, and not a distinct member of the condition, the death of the grantee, within two years from the date of the warrant, would vest a complete title. A construction plainly inconsistent with the views of the legisture.

That residence is considered a distinct part of the condition, is evident from other parts of the section. Thus it says : "And that in default of such actual settlement and residence, it shall and may be lawful," &c. Again, " reciting the original warrants, and that actual settlements and residence have not been made."

The *proviso* also considers settlement and residence as distinct. The party is to persist in endeavors to make an actual settlement ; and if he does so persist, is to hold and enjoy in the same manner as if the actual settlement had been made and continued. If actual *settlement included residence, why say continued ? Settlement is considered as a distinct thing, separately existing, and continued by residence. If the settlement is not made in two years, in peace, is there not a forfeiture ? If so, residence is another essential. If residence is a part of settlement, it must be had in two years ; but residence is to be five years from the first settlement. Then, if you abolish two years, as incompatible with five years, you set all at large ; no time is prescribed for either settlement or residence; because residence is not to be five years from the date of the warrant, but from the first settlement, which may, on this construction, be at any time. There is no means to reconcile the whole, but to construe settlement to be one thing, to be done in two years from the date of the warrant ; and residence to be another, to continue five years from the first settling. Such, then, were the requisites to a complete title.

But at the time of making the act, there was an Indian war, which might probably last more than two years. It was necessary, then, for the legislature to do justice as well to the warrantee who paid money, as to the actual

settler : one of whom might, by the continuance of the war, be prevented. from commencing and completing settlement and residence ; the other be driven from settlement and residence actually commenced. The provision. is, that if the actual settler (with or without warrant) shall be driven there-from, or the warrantee be prevented from making such actual settlement,. " and shall persist in his endeavors to make such actual settlement *as afore-said,*" " then, in either case, he and his heirs shall be entitled to have and to. hold the said lands, in the same manner as if the actual settlement had been: made and continued."

The plaintiff and defendant are at issue upon a great question : Is the condition to be performed, according to the terms of the enacting clause, at some time ?    \*If this is determined in the negative, in what time is [\*23 the matter substituted in lieu of what was required by the enacting clause, to be performed ?   These questions are distinct and independent of each other ; not to be blended together in argument, and if blended, will in-troduce the utmost confusion.

In considering the proviso, it is natural to inquire, 1st. Who are the ob-jects of relief against the condition ?   2d. On what terms, is such relief to be granted ? and 3d. What is that relief ?

1st. The objects of relief under the proviso certainly are persons not having done what was necessary under the former part of the section, to complete their titles ; who had not united settlement and residence ; set-tlers without warrant ; and warrantees, having commenced settlements or not.

2d. If any such " actual settler, or any grantee shall be prevented, by force of arms of the enemies of the United States, from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid, then, in either case,

3d. " He and his heirs shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued."

The terms of relief are, persisting in endeavors to make such actual set-tlement as aforesaid.   The whole question is as to the legitimate meaning of " persist in his endeavors."   For if the grantee or actual settler com-plies with the proper construction as to the thing intended to be done, the condition is done away.

It is contended, that the party must persist, until settlement and resi-dence are actually achieved.   This we say is utterly inconsistent with the letter and spirit of the proviso.   Had the legislature intended this, \*it [\*24 would have been so expressed, and might have been readily done, by a declaration that, during war, time should not run against the warrantee or settler.   Instead of which, a substitute for settlement and residence is plainly introduced.   That substitute is a persisting in endeavors to make such actual settlement as aforesaid.   Instead of requiring a persisting in endeavors,. until settlement and residence actually obtained or made, the law contem-plates something short of settlement and residence, which, being performed, was to operate in the same manner as if the actual settlement and residence had been made and continued.   Such actual settlement, in the proviso,. is considered as distinct from residence ; and to it, as such, the proviso. relates.   And if the party persists in his endeavors to make such actual set-

tlement as aforesaid (that is, clear, fence, cultivate and build, not reside), then he is to hold in the same manner as if the actual settlement had been made and continued; to wit, by residence. In the proviso, residence is nowhere contemplated, except where the effect of persistence in endeavors is declared to be, to hold "in the same manner as if," &c. The legislature having thus plainly considered settlement and residence as different things, have declared that persistence in endeavors to attain the one, shall be equivalent to the actual accomplishment of both. The proviso affords relief on the ground, and solely on the ground, that settlement and residence were not had.

How strange is *their* construction! If the actual settler or warrantee persists in his endeavors, until he actually makes a settlement, with residence, he shall hold the land as if actual settlement had been made and continued. This renders all the words "in the same manner as if," &c., entirely nugatory. This is not the case to which the proviso applies. It applies only to a case in which settlement and residence had not taken place, but in which, from a proper consideration of circumstances, the party was to hold as if, &c., looking to something other which is to be *as if*. *Nullum simile est idem.* As if, does not mean, the same.

*25]  *Persisting in endeavors is all the proviso requires. If unsuccessful, they are still endeavors, within the meaning of the proviso. Attaining the end, is not the only evidence of persisting in endeavors; else all endeavors must necessarily be successful, as, without success, on their principles, there cannot be no endeavors persisted in. If attaining the end was to be absolutely necessary, why did not the legislature expressly prescribe the end and not the means? Or rather, why, having already prescribed the end, in the former part of the section, did they say anything of the endeavor (the means) in the proviso?

By the construction on the other side, the only benefit the grantee or actual settler gains from the proviso, is time, during the actual existence of the impossibility to perform; so that, if the then raging war should last ten years, and the party persist in his endeavors the whole time, his title would still be incomplete, without actual settlement and residence. The legislature never intended to impose such ruinous hardships on persons whose money they had taken, or on actual settlers. If *time* only was their object, why not give it absolutely, during the war, without requiring a circumstance that must be attended with great expense and trouble to the party? Why make endeavors and persistence necessary, unless intended as a substitute for settlement and residence?

On these principles, the proviso does the party more harm than good; it was better for him, at once, to fall a victim to the strict letter of the condition. Had these principles been fairly and clearly avowed and stated in the act, would any man, *flagrante bello*, have paid his money for warrants? No. The state would have remained involved in debt, until the close of the war.

But it is said, you are not to persist in your endeavors during war, but you are to begin, after the peace. There is nothing of this sort in the law; and why, after peace, is persistence required? Why should not the enacting *26]  *clause, after some certain time, recur in full force, if this was the intention? Why not say, that during war, and for such a time after

peace, the condition shall not run against you? Surely, the persistance in endeavors to make a settlement refers to the time during which a hindrance existed; and cannot apply to a time when there would be nothing to hinder the compassing the thing itself.

What is the relief granted? They say, it is only time; a suspension of the forfeiture, during the war. There is no idea of this kind held up in the law. Instead of dispensing with a forfeiture, it dispenses with the condition. It declares, that if something is done, it shall amount to a performance of the condition, and the party shall hold in the same manner as if the condition itself had been performed. It is not enough to say, that the general intention and spirit of the law is only to suspend the forfeiture for a time. Such spirit and intention must be shown and extracted from the bowels of the act.

By our construction, viz., that two years' persistence from the date of the warrant gives a complete title, everything is rendered intelligible and consistent, and every word of the act has its proper meaning and effect. But upon theirs, all is confusion and inconsistency. They confound the larger with the smaller number; they make the legislature speak without any meaning, and they reject whole passages of the law.

If it is settled, that persistence in endeavors to make actual settlement, is a performance of the condition, how long is such persistence to be? Surely, two years only from the date of the warrant, that being the time within which, by the enacting clause, the settlement is to be made, and as persistence is a substitute for settlement, must be for the same term, and not longer.

*The act affords no other terms, no other rule of construction. Persistence cannot apply to the five years' residence, because there can [*27 be no residence without settlement; and when there had been a fruitless perseverance, for two years, in endeavors to attain a settlement, there cannot, in the nature of things, be a persistence to attain residence; for settlement being out of the question, there cannot be residence, which presupposes settlement, and which cannot exist without settlement.

Besides, the proviso excludes all ideas of endeavor being applied to residence; they are attached to settlement, and are to operate as if actual settlement had been made and continued. Consequently, endeavors are only to be commensurate with the time required for settlement, viz., two years from the date of the warrant.

*McKean* (Attorney-General of Pennsylvania), contrà.—The defeat of Harmer in 1790, and of St. Clair in 1791, show that the power of the United States, aided by that of Pennsylvania, was insufficient to protect that part of the country. The view of the legislature, therefore, was the settlement, not the sale of the lands. They reduced the price from $80 to $20 per 100 acres. Settlement was not a condition subsequent, but precedent; or rather, it was a part of the consideration of the sale. With the same view, the legislature reduced the size of the tracts from 1000 to 400 acres, so that on every tract of 400 acres they might have a soldier. It was not their intention, that a large tract should be purchased by any one person or body of men. They meant to have a family upon every tract of 400 acres. The Holland Company purchased 1162 tracts, which was to produce 1162 soldiers, dis

Huidekoper v. Douglass.

tributed among the same number of tracts. The object was, that the country should be settled, during the war, if possible, so as to form a barrier against the incursions of the Indians. But it is said, a peace was in contemplation. If so, why did they enact the proviso? why stipulate for immediate settlement? why oblige purchasers to persist in their endeavors? Immediate settlement was the object; and if so, they could not mean to limit the perseverance to *two years; they meant a perseverance as long as there was any obstacle. Everything in the act shows this to be their meaning.

*28]

The preamble states that the price at which they had been held was so high as to discourage, not purchasers, but actual settlers. The 2d section offers the lands "for sale to persons who will cultivate, improve and settle the same, or cause the same to be cultivated, improved and settled." The 3d section declares, that "upon the application of any person who may have settled and improved, or is desirous to settle and improve, a plantation, within the limits aforesaid, to the secretary of the land-office, there shall be granted to him a warrant for any quantity of land within the said limits, not exceeding 400 acres, requiring the surveyor to cause the same to be surveyed for the use of the grantee, his heirs and assigns for ever." The 5th section prohibits the deputy-surveyor, by virtue of any warrant, to survey any tract of land that may have been actually settled and improved, prior to the date of the entry of such warrant with the deputy-surveyor of the district, except for the owner of such settlement and improvement. The 8th section authorizes the deputy-surveyor, upon application of any person who has made an actual settlement and improvement, to survey and mark out the lines of the tract to which such person may, by conforming to the provisions of this act, become entitled, by virtue of such settlement and improvement, provided it does not exceed 400 acres. The 10th section provides, that the lands thus actually settled and improved, according to the provisions of this act, shall remain liable for the purchase-money and interest from the dates of the improvements. And if such actual settler, not being hindered as aforesaid by death, or the enemies of the United States, shall neglect to apply for a warrant, in ten years after the passing *of this act, the commonwealth may grant the same lands to others, by warrants reciting such defaults.

*29]

The 9th section contains a condition precedent, and if it be not strictly complied with, the purchaser has not title. It is a part of the contract, made with his eyes open. The act must be construed as a contract. The several parts must be considered together. The second and third must refer to the ninth section, and be controlled by it.

What is a condition precedent? It is a condition to be performed, before the estate can vest. As, if a man grant that if A. pay 100 marks before such a day, he shall have the land. No title will vest, until the 100 marks are paid.

It has been considered as a condition precedent, by every judge who has passed sentence upon it. Thus, Judge YEATES, in giving his opinion in the case of the *mandamus*, says, "It is admitted on all sides, that the terms of actual settlement and residence are, in the first place, precedent conditions to the vesting of absolute estates in these lands, and I cannot bring myself to believe, that they are dispensed with, by unsuccessful efforts, either in

Huidekoper v. Douglass.

the case of warrant-holders or actual settlers."(a)    The condition is not dispensed with but in *the case of prevention by death, or by force of    [*30
arms of the enemies of the United States.    The question here arises,

(a) This question has been agitated in a variety of forms, in the state of Pennsylvania, and a great degree of sensibility is said to have been excited on the subject.    In the year 1800, a rule was obtained in the supreme court of Pennsylvania, by the Holland Company, upon the secretary of the land-office, to show cause why a *mandamus* should not be awarded, commanding him to prepare and deliver patents for various tracts of land, for which they had obtained warrants, under the act of April 3d, 1792. The judges delivered their opinions in the following terms :[1]

SHIPPEN, Ch. J.—The legislature, by the act of 3d April 1792, meant to sell the remaining lands of the state, particularly those lying on the north and west of the rivers Ohio and Allegheny.    The consideration-money was to be paid, on issuing the warrants. They had, likewise, another subject, namely, that, if possible, the lands should be settled by improvers.    The latter terms, however, were not to be exacted from the grantees, at all events.    The act passed at a time when hostilities existed on the part of the Indian tribes.    It was uncertain, when they would cease; the legislature, therefore, contemplated that warrants might be taken out, during the existence of these hostilities, which might continue so long as to make it impossible for the warrantees to make the settlements required, for a length of time; not, perhaps, until these hostilities should entirely cease.    Yet, they make no provisions that the settlements should be made within a reasonable time after the peace; but expressly within two years after the dates of the warrants.    As, however, they wished to sell the lands, and were to receive the consideration-money immediately, it would have been unreasonable, and probably, have defeated their views in selling, to require settlements to be made on each tract of four hundred acres, houses to be built, and lands to be cleared, in case such acts should be rendered impossible by the continuance of the Indian war.    They therefore, make the proviso, which is the subject of the present dispute, in the following words: " Provided always, nevertheless, that if any such actual settler, or any grantee, in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued."

When were such actual settlements to be made ? The same section of the act which contains the above proviso, gives a direct and unequivocal answer to this question, " within the space of two years next after the date of the warrant."    If the settlements, were not made within that time, owing to the force or reasonable dread of the enemies. of the United States, and it was evident, that the parties had used their best endeavors. to effect the settlement, then, by the express words of the law, the residence of the improvers for five years afterwards, was expressly dispensed with, and their title to the lands was complete, and patents might issue accordingly.    It is contended, that the words " persist in their endeavors," in the proviso, should be extended to mean, that if, within the two years, they should be prevented, by the Indian hostilities, from making the settlement, yet, when they should be no longer prevented by those hostilities, as by a treaty of peace, it was incumbent on them then to persist to make such settlement. The legislature might, if they had so pleased, have exacted those terms (and they would not, perhaps, have been unreasonable), but they have not done so : they have expressly confined the time of making such settlements to the term of two years from the date of the warrant.    Their meaning and intention can alone be sought for, from the words they have used, in which there seems to me, in this part of the act, to be no great ambiguity.    If the contrary had been their meaning, they would not have made

[1] Commonwealth v. Coxe, 4 Dall. 170.

Huidekoper v. Douglass.

is the prevention and perseverance for two years equivalent to a perform-
ance of the condition? Is the will to be taken for the deed?

*31]          *What is the settlement intended? We say, it includes five years'
           residence. The proviso speaks of " such actual settlement as afore-

---

use of the word "endeavors," which supposes a possibility, at least, if not a probability,
as things then stood, of those endeavors failing, on account of the hostilities, and would,
therefore, have expressly exacted actual settlements to be made, when the purchasers
should no longer run any risk in making them.

The state having received the consideration-money, and required a settlement within
two years, if not prevented by enemies; and in that case, dispensing with the condition
of settlement and residence, and declaring that their title shall be then good and as
effectual, as if the settlement had been made and continued, I cannot conceive they could
mean to exact that settlement, at any future indefinite time. And although it is said
they meant that condition to be indispensable, and that it must be complied with in a
reasonable time, we have not left to us that latitude of construction, as the legislature
have expressly limited the time themselves.

It is urged, that the main view of the legislature was to get the country settled, and
a barrier formed; this was, undoubtedly, one of their views, and for that purpose, they
have given extraordinary encouragement to individual settlers; but they had, likewise
evidently, another view, that of increasing the revenue of the state, by the sale of the
lands. The very title of the act is "for the sale of the vacant land within this
commonwealth;" this latter object they have really effected, but not by the means of
the voluntary settlers; it could alone be effected by the purses of rich men, or large
companies of men, who would not have been prevailed upon to lay out such sums of
money as they have done, if they had thought their purchases were clogged with such
impracticable conditions.

I have hitherto argued upon the presumption, that the words "persist in their
endeavors," relate to the grantees as well as the settlers; but in considering the words
of the proviso, it may be well doubted, whether they relate to any other grantee or
settler than those who have been driven from their settlements; the word "persist"
applies very properly to such: the words of the proviso are, "if such actual settler, or
any grantee, shall, by force of arms of the enemies of the United States, be prevented
from making such settlement, or be driven therefrom, and shall persist in his endea-
vors to make such actual settlement; then, in either case, he and his heirs shall be
entitled," &c. Here, besides that the grammatical construction of referring the word
"persist" to the last antecedent, is best answered, but the sense of it is only applicable
to settlements begun, and not to the condition of the grantees. There are two members
of the sentence; one relates to the grantees, who, it is supposed, may be prevented from
making their settlements; the other to the settlers, who are supposed to be driven away
from the settlements. The latter words, as to them, are proper; as to the grantees
who never began a settlement, improper. The act says, in either case, that is, if the
grantees are prevented from making their settlements, or if the settlers are driven
away, and persist in their endeavors to complete their settlements, in either case, they
shall be entitled to the land. I will not say, this construction is entirely free from
doubt; if it was, there would be an end of the question.

But taking it for granted, as it has been done at the bar, that the words relate to the
grantees, as well as the settlers; yet, although inaccurate with regard to the former,
it seems to me, the legislature could only mean to exact from the grantees their best
endeavors to make the settlements, within the space of two years from the date of their
warrants; at the end of which time, if they have been prevented from complying with
the terms of the law, by the actual force of the enemy, as they had actually paid for the
land, they are then entitled to their patents. If the legislature really meant differently,
all I can say is, that they have very unfortunately expressed their meaning.

18

said," thereby referring to the description of settlement in the former part of the section, that is, " by clearing, fencing and cultivating, at least *two acres for every hundred, erecting thereon a messuage for the　[*32

---

The propriety of awarding a *mandamus* is another question, which I mean not to discuss, as I presume a decision of a majority of the court will make it unnecessary.

YEATES, J.—I have long hoped and flattered myself, that the difficulties attendant on the present motion would have been brought before the justice and equity of the legislature for solution, and not come before the judicial authority, who are compelled to deliver the law as they find it written for decision; the question has often occurred to our minds, under the act of 3d of April 1792, which has so frequently engaged our attention in our western circuits.

The Holland Company have paid to the state the consideration-money of 1162 warrants, and the surveying fees on 1048 tracts of land; besides making very considerable expenditures by their exertions, honorable to themselves, and useful to the community (as has been correctly stated), in order to effect settlements. Computing the sums advanced, the lost tracts by prior improvements and interferences, and the quantity of one hundred acres granted to each individual for making an actual settlement on their lands; it is said, that averaging the whole, between $230 and $240 have been expended by the company, on each tract of land they now lay claim to.

The Indian war which raged previous to, and and at the time of the passing of the law, and until the ratification of the treaty at Fort Grenville, must have thrown insurmountable bars in the way of those persons, who were desirous of sitting down immediately on lands, at any distance from the military posts. These obstacles must necessarily have continued for some time after the removal of impending danger, from imperious circumstances; the scattered state of the inhabitants, and the difficulty of early collecting supplies of provisions; besides, it is obvious, that settlements, in most instances, could not be made until the lands were designated and appropriated by surveys, and more especially so, where warrants have express relation to others depending on a leading warrant, which particularly locates some known spot of ground.

On the head of merit, in the Holland Land Company's sparing no expense to procure settlements, I believe, there are few dissenting voices beyond the mountains; and one would be induced to conclude, that a variety of united, equitable circumstances, would not fail to produce a proper degree of influence on the public will of the community. But we are compelled by the duties of our office, to give a judicial opinion upon the abstract legal question; whether, if a warrant-holder, under the act of 3d of April 1792, has begun to make his actual settlement, and is prevented from completing the same, "by force of arms of the enemies of the United States, or is driven therefrom," and shall make new endeavors to complete the same, but fails in the accomplishment thereof, the condition of actual settlement and residence is dispensed with and extinguished? I am constrained, after giving the subject every consideration in my power, to declare, that I hold the negative of the proposition, for the following reasons collected from the body of the act itself.

1. The motives inducing the legislature to enact the law are distinctly marked in the preamble, that " the prices fixed by law for other lands " (than those included in the Indian purchase of 1768) " are found to be so high, as to discourage actual settlers from purchasing and improving the same." 3 Dall. Laws 209.

2. "The lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, are offered for sale to persons who will cultivate, improve and settle the same, or cause the same to be cultivated, improved and settled, at and for the price of 7l. 10s. for every hundred acres thereof." By § 2, the price of lands is thus lowered, to encourage actual settlements.

3. By § 3, " upon the application of any person who may have settled or improved, or is desirous to settle and improve, a plantation, within the limits aforesaid, there shall be granted to him a warrant not exceeding four hundred acres," &c. The application

habitation of man, and residing, or causing a family to reside thereon, for
the space of five years next following his first settling of the same."

\*33]     \*By the proviso, no time is limited for the persisting. We say, it
means persisting with effect ; otherwise, the object of the legislature·

---

granted, is not to take up lands ; but it must be accompanied, either by a previous set-
tlement and improvement, or expressions of a desire to settle and improve a plantation;
and in this form, all such warrants have issued.

4. By § 5, "lands actually settled and improved, prior to the date of the entry of
a warrant with the deputy-surveyor of the district, shall not be surveyed thereon, ex-
cept for the owner of such settlement and improvement." This marked preference of
actual settlers over warrant-holders, who may have paid their money into the treasury
for a particular tract, even, perhaps, before any improvement of the land was medi-
tated, shows, in a striking manner, the intentions of the legislature.

5. By § 8, "the deputy-surveyor of the district shall, upon the application of any
person who has made an actual settlement and improvement on these lands, survey
and mark out the lines of the tract of land, not exceeding four hundred acres for such
applicant." The settlement and improvement alone are made equivalent to a warrant ;
which may be taken out, by § 10, ten years after the time of passing this act.

6. I found my opinion, on what I take to be the true and legitimate construction of
§ 9, in the close of which, is to be found the proviso, from whence spring all the
doubts on the subject.

It has been said at the bar, that three different constructions have been put on this
section. 1. That if the warrant-holder has been prevented by Indian hostilities, from
making his settlement within two years next after the date of his warrant, and until
the 22d of December 1795 (the time of ratification of Gen. Wayne's treaty), the condi-
tion of settlement and residence is extinct and gone. 2. That though such prevention
did not wholly dispense with the condition, it hindered its running within that period;
and that the grantee's persisting in his endeavors to make an actual settlement and res-
idence for five years, or within a reasonable time thereafter, shall be deemed a full com-
pliance with the conditions. And 3. That in all events, except the death of the party,
the settlement and residence shall precede the vesting of the complete and absolute
estate.

Though such great disagreement has obtained, as to the true meaning of this § 9,
both sides agree in this, that it is worded very inaccurately, inartificially and obscurely.
Thus, it will be found towards the beginning of the clause, that the words "actual set-
tlement" are used in an extensive sense, as inclusive of residence for five years ;
because its constituent parts are enumerated and described to be by "clearing, fencing
and cultivating at least two acres for every hundred acres, contained in one survey ;
erecting thereon a messuage for the habitation of man, and residing, or causing a family
to reside thereon, for the space of five years next following his first settling the same,
if he or she shall so long live." In the middle of the clause, the same words are used
in a more limited sense, and are coupled with the expressions "and residence," and in
the close of the section, in the proviso, the same words, as I understand them, in a
strict grammatical construction of the whole clause, must be taken in the same large·
and comprehensive sense as they first conveyed ; because the terms "such actual set-
tlement," used in the middle of the section, are repeated in the proviso, and refer to the·
settlement described in the foregoing part ; and the words "actual settlement as afore-
said," evidently relate to the enumeration of the qualities of such settlement. Again,
the confining of the settlement to be within the space of two years next after the date.
of the warrant, seems a strange provision. A war with the Indian natives subsisted,
when the law passed, and its continuance was uncertain. The state of the country
might prevent the making of surveys for several years; and until the lands were
appropriated by surveys, the precise places where they lay could not be ascertained.
generally.

Huidekoper v. Douglass.

would be totally defeated, if the war should continue two years after the date of *the warrants. Besides, the proviso would be repugnant to the enacting clause, and therefore void. It only provides that the incipient title should not be lost during the war, if thereby the settlement [*34

---

Still, I apprehend, that the intention of the legislature may be fairly collected from their own words. But I cannot accede to the first construction said to have been made of the proviso in this ninth section; because it rejects as wholly superfluous, and assigns no operation whatever to the subsequent expressions, "if any grantee shall persist in his endeavors," &c., which is taking an unwarrantable liberty with the law. Nor can I subscribe to the second construction stated, because it appears to me, to militate against the general spirit and words of the law, and distorts its great prominent features, in the passages already cited, and for other reasons which I shall subjoin. I adhere to the third construction, and will now again consider § 9. It enacts, in the first instance, that "no warrant or survey for lands, lying north and west of the rivers Ohio and Allegheny and Conewango creek, shall vest any title, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall, within the space of two years next after the date of the same, make or cause to be made, an actual settlement thereon, by clearing, &c.: provided always, nevertheless, that if any such settler, or any grantee, in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid; then, in either case, he and his heirs shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued."

"Persist" is the correlative of attempt or endeavor, and signifies "hold on," "persevere," &c.; the beginning words of the section restrict the settlement "to be within two years next after the date of the warrant, by clearing, &c., and by residing for the space of five years, next following his first settling of the same, if he or she shall so long live," and in default thereof, annexes a penalty of forfeiture in a mode prescribed; but the proviso relieves against this penalty, if the grantee is prevented from making such settlement by force, &c., and shall persist in his endeavors to make such actual settlement as aforesaid. The relief, then, as I read the words, goes merely as to the times of two years next after the date of the warrant, and five years next following the party's first settling of the same; and the proviso declares, that persisting, &c., shall be equivalent to a continuation of the settlement.

To be more intelligible, I paraphrase the ninth section thus: Every warrant-holder shall cause a settlement to be made on his lands, within two years next after the date of his warrant, and a residence thereon for five years next following the first settlement, on pain of forfeiture by a new warrant; nevertheless, if he shall be interrupted or obstructed by external force, from doing these acts within the limited periods, and shall afterwards persevere in his efforts, in a reasonable time after the removal of such force, until those objects are accomplished, no advantage shall be taken of him for the want of a successive continuation of his settlement.

The construction I have adopted, appears to me to restore perfect symmetry to the whole act, and to preserve its due proportions. It affords an easy answer to the ingenious question proposed by the counsel of the Holland Company. If, say they, immediately after a warrant issues, a settler, without delay, goes on the ground, the 11th April 1792, and stays there until the next day, when he is driven off by a savage enemy, after a gallant defence; and then fixes his residence as near the spot as he can consistently with his personal safety, does the warrantee lose all pretensions of equity? Or, suppose, he has the good fortune to continue there, firmly adhering to the soil, for two or three years, during the Indian hostilities; but is, at length, compelled to remove by a superior force; is all to go for nothing, and must he necessarily begin again? I answer to both queries in the negative—by no means. The proviso supplies the

was prevented. *Every person who claims under this act must be an actual settler. It does not say, that if the grantee or actual settler shall be prevented, or driven away, he shall hold ; but, if prevented or driven away, and he shall persist, then he shall hold.

---

chasm of successive years of residence ;. for every day and week he resides on the soil, he is entitled to credit in his account with the commonwealth; but upon a return of peace, when the state of the country will admit of it, after making all reasonable allowances, he must resume the occupation of the land, and complete his actual settlement. Although a charity cannot take place according to the letter, yet it ought to be performed *cy pres*, and the substance pursued. 2 Vern. 266 ; 2 Fonbl. 221.

It has been objected, that such a contract with the state is unreasonable, and hard on those land-holders, and ought not to be insisted upon : it will be said, in reply, they knew the terms before they engaged in the bargain, and must abide by the consequences. The only question is, whether the interpretations given of it be correct or not.

7. A due conformity to the provisions of the act is equally exacted of those who found their preference to lands on their personal labor, as of those who ground it on the payment of money. I know of no other distinctions between these two sets of land-holders, as to actual settlement and residence, than that the claims of the former must be limited to a single plantation, and the labor be exerted by them, or under their direction ; while the latter may purchase as many warrants as they can, and make, or cause to be made, the settlements required by law. Addison 340-41.

It is admitted, on all sides, that the terms of actual settlement and residence are, in the first place, precedent conditions to the vesting of absolute estates in these lands ; and I cannot bring myself to believe, that they are dispensed with, by unsuccessful efforts, either in the case of warrant-holders, or actual settlers. In the latter instance, our uniform decisions have been, that a firm adherence to the soil, unless controlled by imperious circumstances, was the great criterion which marked the preference in such cases ; and I have seen no reason to alter my opinion.

8. Lastly, it is obvious from the preamble, and § 2, that the settlement of the country, as well as the sale of lands, were meditated by this law ; the latter, however, appears to be a secondary object with the legislature. The peopling the country, by a hardy race of men, to the most extreme frontier, was certainly the most powerful barrier against a savage enemy.

Having been thus minute, and, I fear, tedious, in delivering my opinion, it remains for me to say a few words respecting those persons who have taken possession of part of these lands, supposing the warrants to be dead, according to the cant word of the day, and who, though not parties to this suit, are asserted to be implicated in our decision. If the lands are forfeited in the eye of the law, though they have been fully paid for, the breach of the condition can only be taken advantage of by the commonwealth, in a method prescribed by law. Innumerable mischiefs and endless confusion would ensue, from individuals taking upon themselves to judge when warrants cease to have validity, and making entries on such lands at their will and pleasure. I will repeat what we told the jury in Morris's Lessee *v.* Neighman and Shaines :[1] " If the expressions of the law were not as particular as we find them, we should have no difficulty in pronouncing that no person should take advantage of their own wrong, and that it does not lie in the mouths of men, like those we are speaking of, to say the warrants are dead ; we will take and withhold the possession, and thereby entitle ourselves to reap benefits from an unlawful act." On the whole, I am of opinion, that the rule should be discharged.

SMITH, J.—I have had a full opportunity of considering the opinion delivered by my brother YEATES : and as I perfectly concur in all its principles, I shall confine myself to a simple declaration of assent. I could not hope, indeed, to add to the argu-

Huidekoper v. Douglass.

*What is persisting ? Buying implements? No. Going on the land ? We do not contend for that. But still it is something, and who is to determine what it is ? It is a fact which must be decided by a jury in every case ; which would be productive of endless litigation.

---

ment ; and I am certain, I could not equal the language, which he has used on the occasion.

By THE COURT.—Let the rule be discharged.

Since this decision was pronounced, the subject has been revived and agitated in various interesting forms. In the winter of 1801-2, several petitions were presented by the intruders to the legislature, requesting their interposition, but the committee of the senate, to whom these petitions were referred, reported against them, and admitted, that the controversy belonged exclusively to the courts of justice. But soon after this report was made, a bill was introduced, which recited the existing controversies, gave a legislative opinion against the claim of the warrantees, and instituted an extraordinary tribunal to hear and decide between the parties. The appearance of this bill produced two remonstrances from the Holland Company, but without effect. As soon as it became a law, the attorney-general and the counsel for the company were invited to a conference with the judges, on the carrying of it into effect; but, upon mature consideration, the counsel for the company declined taking any part in the business, and assigned their reasons in a letter addressed to the judges, dated the 24th of June 1802. An issue was then formed, by the direction of the judges, which was tried at Sunbury, on the 25th of November following, before YEATES, SMITH and BRACKENRIDGE, Justices.[1]

The charge, as delivered by Mr. Justice YEATES, is as follows: That the decision of the court and jury on the the present feigned issue should "settle the controversies arising from contending claims to lands north and west of the rivers Ohio and Allegheny and Conewango creek," is an event devoutly to be wished for by every good citizen. "It is indispensably necessary that the peace of that part of the state should be preserved, and complete justice done to all parties interested, as effectually as possible." (Close of preamble to the act of 2d April 1802, p. 155.) We have no hesitation in declaring, that we are not without our fears, that the good intentions of the legislature, expressed in the law under which we now sit, will not be effected. We hope we shall be happy enough to acknowledge our mistake hereafter.

It is obvious, that the validity of the claims of the warrant-holders, as well as of the actual settlers, must depend upon the true and correct construction of the act of the 3d April 1792, considered as a solemn contract between the commonwealth and each individual. The circumstances attendant on each particular case may vary the general legal conclusion in many instances.

We proceed to the discharge of the duties enjoined on us by the late act. The first question proposed to our consideration is as follows: Are warrants heretofore granted under the act of 3d April 1792, valid and effectual in law, against this commonwealth, so as to bar this commonwealth from granting the same land to other applicants, under the act aforesaid, in cases where the warrantees have not fully and fairly complied with the conditions of settlement, improvement and residence required by the said act, at any time before the date of such warrants respectively, or within two years after ?

It will be proper here to observe, that on the motion for the *mandamus* to the late secretary of the land-office, at the instance of the Holland Company, the members of this court, after great consideration of the subject, were divided in their opinions. The Chief Justice seemed to be of opinion, that if a warrantee was, "by force of arms of the enemies of the United States, prevented from making an actual settlement, as described in the act, or was driven therefrom, and should persist in his endeavors to make such actual settlement thereafter," it would amount to a performance of the condition in law. Two of us (YEATES and SMITH) thought, that in all events, except the death of

[1] Attorney-General v. The Grantees, 4 Dall. 237.

23

*When the prevention ceased, they were to settle in a reasonable time ; otherwise the purchaser of 1793 would be in a better situation than the purchaser of 1796, because the former would get his title, without the condition of settlement.

---

the party, the settlement and residence contemplated by the act, should precede the vesting of the complete and absolute estate, and that "every warrant-holder should cause a settlement to be made on his lands, within two years next after the date of the warrant, and a residence thereon for five years next following the first settlement, on pain of forfeiture, by a new warrant; but if, nevertheless, he should be interrupted or obstructed by force of the enemy from doing those acts, within the limited periods, and shall afterwards persevere in his efforts, in a reasonable time after the removal of such force, until these objects should be accomplished, no advantage shall be taken of him for the want of a successive continuation of his settlement." To this opinion, Judge BRACKENRIDGE subscribes.

It would ill become us to say, which of these constructions is entitled to a preference. It is true, that in the preamble of the act of the 2d April 1802 (p. 154), it is expressed, that "it appears from the act aforesaid (3d of April 1792), that the commonwealth regarded a full compliance with those conditions of settlement, improvement and residence, as an indispensible part of the purchase or consideration of the land itself." But it is equally certain, that the true test of title to the lands in question must be resolved into the legitimate meaning of the act of 1792, extracted *ex viceribus suis*, independent of any legislative exposition thereof. I adhere to the opinion which I formerly delivered in bank ; yet, if a different interpretation of the law shall be made by courts of competent jurisdiction in the dernier resort, I shall be bound to acquiesce, though I may not be able to change my sentiments. If the meaning of the first question be, are titles under warrants issued under the law of the 3d of April 1792, for lands north and west of the rivers Ohio and Allegheny and Conewango creek, good and available against the commonwealth, so as to bar the granting of the same land to other applicants, where the warrantees have not fully and fairly complied with the conditions of settlement, improvement and residence, required by the law, at any time before, or within two years after, the dates of the respective warrants, in time of profound peace, when they were not prevented from making such actual settlement, by force of arms of the enemies of the United States, or reasonable and well-grounded fear of the enemies of the savages ? The answer is ready, in the language of the acts before us, and can admit of no hesitation.

"No warrant or survey for those lands shall vest any title, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall, within the space of two years next after the date of the same, make or cause to be made, an actual settlement thereon, by clearing, &c., and in default thereof, it shall and may be lawful to and for the commonwealth to issue new warrants to other actual settlers for the said lands, or any part thereof," &c. (Act of the 3d of April 1792, § 8.) For "the commonwealth regarded a full compliance with these conditions of settlement and residence as an indisputable part of the purchase or consideration of the lands so granted." (Preamble to act of 1802.)

But if the true meaning of the question be, whether under all given or supposed circumstances of peace or war, of times of perfect tranquillity or imminent danger, such warrants are not *ipso facto* void and dead in law? we are constrained to say, that our minds refuse assent to the general affirmative of the proposition.

We will exemplify our ideas on this subject. Put the case, that a warrant taken out, early in 1792, calls for an island, or describes certain land, with accuracy and precision, by the course of waters, or other natural boundaries, distant from any military post, and that the warrantee, after evidencing the fullest intentions of making an actual settlement on the land applied for, by all the necessary preparation of provisions, implements of husbandry, laborers, cattle, &c., cannot, with any degree of personal

*If the settlement is begun within the two years, and continued for five years, it is sufficient.   Until a survey, there could be no appropriation ; and until appropriation, there could be no settlement, and there could be no effectual residence, unless the settlement was made *with-   [*39

---

safety, seat himself on the lands, within two years after the date of the warrant, and by reason of the just terror of savage hostilities.   Will not the proviso in the 9th section of the act of 3d April 1792, excuse the temporary non-performance of an act, rendered highly dangerous, if not absolutely impracticable, by imperious circumstances, over which he had no control? Or suppose, another warrant, depending, in point of description, on other leading warrants, which the district-surveyor, either from the state of the country, the hurry of the business of his office, or other causes, could not survey, until the two years were nearly expired, and the depredations of the Indians should intervene for the residue of the term, will not this also suspend the operation of the forfeiture ? Nothing can be clearer to us, than that the terms of the proviso embrace and aid such cases; and independent of the strong expressions made use of, we should require strong proof to satisfy our minds that the legislature could possibly mean to make a wanton sacrifice of the lives of her citizens.[1]

It is said in the books, that conditions rendered impossible by the act of God are void.   Salk. 170; 2 Co. 79 *b ;* Co. Litt. 206 *a ;* 290 *b ;* 1 Roll. Abr. 449, pl. 50 ; 1 Fonbl. 199.   But conditions precedent must be strictly performed to make the estate vest, and though become impossible, even by the act of God, the estate will not vest ; *aliter,* of conditions subsequent.   12 Mod. 183; Co. Lit. 218 *a ;* 2 Vern. 339; 1 Ch. Cas. 129, 138 ; Salk. 231 ; 1 Vern. 183; 4 Mod. 66.   We desire to be understood to mean, that the " prevention by force of arms of the enemies of the United States" does not, in our idea, absolutely dispense with and annul the conditions of actual settlement, improvement and residence, but that it suspends the forfeiture, by protracting the limited periods.   Still, the conditions must be performed *cy pres,* whenever the real terror arising from the enemy has subsided, and he shall honestly persist in his endeavors to make such actual settlement, improvement and residence, until the conditions are fairly and fully complied with.

Other instances may be supposed, wherein the principles of prevention may effectually be applicable.   If a person, under the pretence of being an actual settler, shall seat himself on lands previously warranted and surveyed, within the period allowed, under a fair construction of the law, to the warrantee, for the making his settlement, withhold the possession, and obstruct him from making his settlement, he shall derive no benefit from this unlawful act.   If the party himself is the cause wherefore the condition cannot be performed, he shall never take advantage.   Co. Litt. 206; Doug. 661; 1 Rol. Abr. 454, pl. 8 ; Godb. 76 ; 5 Vin. 246, pl. 25.

We trust, that we have said enough to convey our sentiments on the first point. Our answer to the question, as proposed, is, that such warrants may or may not be valid and effectual in law against the commonwealth, according to the several times and existing facts accompanying such warrants.   The result of our opinion, founded on our best consideration of the matter is, that every case must depend on, and be governed by, its own peculiar circumstances.

The second question for decision is, are the titles that have issued from the land-office, under the act aforesaid, whether by warrant or patent, good and effectual against the commonwealth, or any person claiming under the act aforesaid, in cases where such titles have issued on the authority, and have been grounded on the certificates of two justices of the peace, usually called prevention certificates, without any other evidence being given of the nature and circumstances of such prevention, whereby, as is alleged,

[1] In Hazard *v.* Lowry, 1 Binn. 166, it was ruled, that the proviso excuses a survey, as well as a settlement; and that two years after the pacification, by General Wayne's treaty, was a reasonable time for making a settlement which had been prevented by the enemy.

Huidekoper v. Douglass.

in the two years. Did the legislature mean to dispense with the five-years' residence, if the settlement could not be made in two years? The 9th section says, the title shall not vest, unless, &c. The only difficulty was, to limit the time within which the settlement should be made. *If the settlement is incomplete, he is still to persist. If the improvements·

*40]

the conditions of settlement, improvement and residence, required by the said act, could. not be complied with?

It was stated in evidence, on the motion for the *mandamus*, and proved on this trial, that the board of property, being desirous of settling a formal mode of certificate on· which patents might issue for lands north and west of the rivers Ohio and Allegheny and Conewango creek, required the opinion of Mr. Ingersoll, the then attorney-general, thereon; on due consideration, a form was afterwards adopted, on the 21st of December 1797, which was ordered to be published in the Pittsburgh Gazette, and patents. issued, of course, on the prescribed form being complied with.

The received opinion of the supreme executive magistrate, the attorney-general, the· board of property, and of a respectable part of the bar (whose sentiments on legal questions will always have great and deserved weight), at that day, certainly was, that if a warrant-holder was prevented by force of arms of the enemies of the United States. from making his actual settlement, within two years after the date of his warrant, and afterwards persisted in his endeavors to make such settlement, that the condition was. extinguished and gone. Persisting in endeavors, was construed to mean something, attempts, essays, &c., but that did not imply absolute success, or accomplishment of the objects intended to be effected. By some, it was thought, that the endeavors were· only to be commensurate as to the time of making the actual settlement, and were tantamount, and should avail the parties "in the same manner as if the actual settle-· ment had been made and continued."

The decisions of the court in Morris's Lessee *v.* Neighman and Shaines,[1] at Pitts-burgh, May 1799, tended to make the former opinion questionable; and two of the· justices of the supreme court adopted a different doctrine, in their judgment between the Holland Company and Tench Coxe.[2] In the argument in that case, it was insisted by the counsel for the plaintiffs, that the board of property, in their resolves, and the· governor, by his patent, represented the commonwealth, *pro hâc vice;* and that interests vested·under them which could not afterwards be defeated.

We cannot subscribe hereto. If the conditions of settlement, improvement and. residence are indispensable, at all events, they become so by an act of the different branches of the legislature. The governor, who has a qualified negative in the passing· of laws, cannot dispense with their injunctions; it cannot be said, that this case falls. within the meaning of the 9th section of the second article of the constitution; "The· governor shall have power to remit fines and forfeitures, and grant reprieves and par-dons, except in case of impeachment;" it relates merely to penalties consequent on public offences: nor can it be pretended, that the board of property, by any act what-ever of their own, can derogate from the binding force of law. But the fact is, an intention of dispensing with the law of 1792 cannot, with any degree of justice, be· ascribed to the governor or board of property for the time being. They considered themselves, in their different functions, virtually discharging their respective duties in carrying the act into execution, according to the generally received opinion of the day; they never intended to purge a forfeiture, if it had really accrued, nor to excuse the· non-performance of a condition, if it had not been complied with agreeable to the pub-lic will, expressed in a legislative contract.

The rule of law is thus laid down in England. A false or partial suggestion by the grantee to the king, to the king's prejudice, whereby he is deceived, will make the· grant of the king void. Hob. 229; Cro. Eliz. 632; Yelv. 48; 1 Co. 44 *a*, 51 *b;* 3 Leon.. **5;** 2 Hawk. 398; 3 Bl. Com. 226. But where the words are the words of the king, and·

[1] 4 Dall. 209.       [2] Ibid. 171.

are made, but the residence not completed, it is said, he is not to persist.
But the proviso says, that if the actual settler shall be driven off, and shall
persist, &c. What is he to persist to do? Something, *certainly,     [*41
which remained to be done; and nothing remained to be done but to
complete his residence. But if he persist in his endeavors to do this, the

---

it appears that he has only mistaken the law, there he shall not be said to be so de-
ceived to the avoidance of the grant, *per* Sir SAMUEL EYRE, J., 1 Ld. Raym. 50; 6 Co.
55 *b*, 56 *b*, accord. But if any of the lands concerning which the question arises, be-
come forfeited, by the omission of certain acts enjoined on the warrant-holders, they do·
not escheat to the governor for the time being, for his benefit; nor can he be prejudiced
as governor by any grant thereof; they become vested in the whole body of the citi-
zens, as the property of the commonwealth, subject to the disposition of the laws.

We are decidedly of opinion, that the patents, and the prevention certificates re-
cited in the patents, are not conclusive against this commonwealth, or any person claim-
ing under the act of 3d of April 1792, of the patentees having performed the conditions
enjoined on them, although they have pursued the form prescribed by the land-
officers. But we also think, that the circumstance of recital of such certificates will
not, *ipso facto*, avoid and nullify the patent, if the actual settlement, improvement and
residence, pointed out by the law, can be established by other proof. We must repeat
on this head, what we asserted on the former, that every case must be governed by its
own peculiar circumstances. Until the facts really existing, as to each tract of land,
are ascertained with accuracy, the legal conclusion cannot be drawn with any degree of
correctness. *Ex facto oritur jus.*

2. Here we feel ourselves irresistibly impelled to mention a difficulty which strikes
our minds forcibly. Our reflections on the subject have led us to ask ourselves this
question on our pillows. What would a wise, just and independent chancellor decree
on the last question? Executory contracts are the peculiar objects of chancery juris-
diction, and can be specifically enforced by chancery alone; equity forms a part of our
law, says the late chief justice truly. 1 Dall. 213.

If it had appeared to such a chancellor, by the pleading or other proofs, that the
purchase-money had been fully paid to the government by the individual, for a tract
of land, under the law of the 3d April 1792; that times of difficulty and danger had
intervened; that sums of money had been expended to effect an actual settlement, im-
provement and residence, which had not been accomplished fully; that by means of an
unintentional mistake on the part of the state-officers in granting him his patent; not
led to that mistake by any species of fraud or deception on the part of the grantee; he
had been led into an error and lulled into a confidence, that the conditions of the grant
had been legally complied with, and therefore, he had remitted in his endeavors there-
in; would not he think, that under all these circumstances, thus combined, equity
would interpose and mitigate the rigid law of forfeiture, by protracting the limited
periods? And would it not be an additional ground of equity, that the political state
of the country has materially changed since 1792, by a surrender of the western posts
to the government of the United States, and peace with the Indian nations, both which
rendered an immediate settlement of the frontiers, in some measure, less necessary
than heretofore?

But it is not submitted to us to draw the line of property to these lands; they must
be left to the cool and temperate decisions of others, before whom the questions of
title may be agitated. We are confined to the wager, on the matters before us, and
on both questions we have given you our dispassionate sentiments, formed on due
reflection, according to the best of our judgment. We are interested merely as com-
mon citizens, whose safety and happiness is involved in a due administration of the·
laws. We profess and feel an ardent desire that peace and tranquillity should be per-
served to the most remote inhabitants of this commonwealth.

Huidekoper v. Douglass.

time during which he is prevented and persists, shall go to his credit. Hence, there must be a persistence for five years at least.

*42]          *The warrant gave a right to enter the land, to survey it, and to make the settlement. But this right would be forfeited, under the

---

The same question was again agitated in the circuit court of the United States, in April 1803, in the case of Balfour's Lessee v. Meade.[1] The charge of Judge Washington to the jury was as follows:—

WASHINGTON, J.—The importance of this cause led the court to wink at some irregularities in the argument of it at the bar, which has tended to protract it to an unreasonable length. Depending on the construction of laws of the state, and particularly on that of the 3d of April 1792, it had, at first, the appearance of a difficult and very complicated case. It is not easy, at the first reading of a long statute, to discover the bearings of one section upon another, so as to obtain a distinct view of the meaning and intention of the legislature. But the opinion I now entertain was formed on Saturday, before we parted, open, however, as it always is, to such alterations as ulterior reason and argument may produce.

The better to explain and to understand the subject, it will be necessary to take a general view of the different sections of the act of the 3d of April 1792, upon which this cause must turn. The first section reduces the price of all vacant land, not previously settled or improved within the limits of the Indian purchase made in 1768, and all precedent purchases, to 50s. for every 100 acres; that of the vacant lands within the Indian purchase made in 1784, lying east of Allegheny river and Conewango creek, to 5l., to be granted to purchasers in the manner authorized by former laws. The second section offers for sale all the other lands of the state, lying north and west of the Ohio, Allegheny and Conewango, to persons who will cultivate, improve and settle the same, or cause it to be done, at the price of 7l. 10s. per hundred acres, to be located, surveyed and secured as directed by this law. It is to be remarked, that all the above lands lie in different districts, and are offered at different prices. Title to any of them may be acquired by settlement, and to all except those lying north and west of the Ohio, Allegheny and Conewango, by warrant, without settlement.

The third section, referring to all the above lands, authorizes application to the secretary of the land-office by any person having settled or improved, or who was desirous to settle and improve a plantation to be particularly described, for a warrant for any quantity of land not exceeding 400 acres; which warrant is to authorize and require the surveyor-general to cause the same to be surveyed, and to make return of it, the grantee paying the purchase-money and fees of the office. The eighth section, which I notice in this place because intimately connected with the third section, directs the deputy-surveyor to survey and mark the lines of the tract upon the application of the settler. This survey, I conceive, has no other validity than to furnish the particular description, which must accompany the application at the land-office for a warrant. The fourth section, amongst other regulations, protects the title of an actual settler, against a warrant entered with the deputy-surveyor posterior to such actual settlement.

The ninth section, referring exclusively to the lands north and west of the Ohio, Allegheny and Conewango, declares, "that no warrant or survey of lands within that district shall give a title, unless the grantee has, prior to the date of the warrant, made or caused to be made, or shall, within two years after the date of it, make or cause to be made, an actual settlement, by clearing, fencing and cultivating two acres at least in each hundred acres, erecting thereon a house for the habitation of man, and residing, or causing a family to reside, thereon for five years next following his first settling the same, if he shall so long live, and in default of such actual settlement and residence, other actual settlers may acquire title thereto."

Let us now consider this case, as if the law had stopped here. A title to the land in controversy lying north and west of the Ohio, Allegheny and Conewango, could be

[1] 4 Dall. 363.

28

Huidekoper v. Douglass.

former part of the section, if not exercised in two years. This was the right, which the proviso meant to protect, and nothing more. This is the right which is saved, *by persisting as long as the prevention continues. But when the prevention ceases, the ultimate condition of settlement [*43.

acquired in no other manner than by actual settlement; no sum of money could entitle a person to a warrant, unless the application was preceded by actual settlement on the land, or if not, so preceded by actual settlement, the warrant would give no title, unless it were followed by such settlement within two years thereafter. The question then is, what constitutes such an actual settler, within the meaning and intention of this law, as will vest in him an inceptive title, so as to authorize the granting to him a warrant ? not a *pedis possessio ;* not the erection of a cabin, the clearing or cultivation of a field. These acts may deserve the name of improvements, but not settlements. There must be an occupancy accompanied with a *bonâ fide* intention to reside and live upon the land, either in person or by that of his tenant; to make it the place of his habitation, not at some distant day, but at the time he is improving; for if this intention be only future, either as to his own personal residence or that of a tenant, then the execution of that intention by such actual residence fixes the date; the commencement of the settlement, and the previous improvements, will stand for nothing in the calculation.

The erection of a house, and the clearing and cultivating the ground, all or either of them, may afford evidence of the *quo animo* with which it was done, of the intention to settle; but neither nor all will constitute a settlement, if unaccompanied by residence. Suppose, then, improvements made, the person making them declaring at the time that they were intended for temporary purposes of convenience, and not with a view to settle and reside ; could this be called an actual settlement, within the meaning and intention of the legislature ? Surely, no. But though such acts against express declarations of the *quo animo* will not make a settlement, it does not follow, that the converse of the proposition will; for a declaration of an intention to settle, without actually carrying that intention into execution, will not constitute an actual settlement.

How do these principles apply to the case of the plaintiff. In 1793, he leaves the fort at which he was stationed, and in which he was an officer, with a few soldiers ; cuts down some trees, erects four or five pens (for not being covered, they do not deserve the name of cabins), and in five, six or seven days, having accomplished this work, he returns into the fort, to his former place of residence. Why did he retreat so precipitately ? We hear of no danger existing at the time of completing these labors, which did not exist during the time he was engaged in them. What prevented him from proceeding to cover the cabins, and from inhabiting them ? Except the state of general hostility which existed in that part of the country, there is no evidence of a particular necessity for flight, in the instance of this plaintiff. It is most obvious, that the object of his visit to this wilderness was, to erect what he considered to be improvements; but they were, in fact, uninhabitable by a human being, and consequently, could not have been intended for a present settlement. He was, besides, an officer in the army, and whilst in that service, he could not settle and reside at his cabin, although the country had been in a state of perfect tranquillity. In short, his whole conduct, both at that time and afterwards ; his own statements when asserting a title to the lands, the recitals in his warrants of acceptance, and certificates of survey, all afford proof which is irresistible, that he did not mean, in 1793, to settle. Mistaking the law, as it seems many others have done in this respect, he supposed, that an improvement was equivalent to a settlement, for vesting a right to those lands. It is not pretended, even now, nor is it proved by a single witness, not even by Crouse, who assisted in making the improvements, that he contemplated a settlement. It has been asked, could the legislature have meant to require persons to sit down for a moment on lands encompassed by dangers from a savage enemy ? I answer, no. At such a time it was very improbable, that men would be found rash enough to make settlements.

is still to be performed.  As the law does not require impossibilities, a reasonable time after cessation *of the war must be allowed to make the settlement.  We say, two years is that reasonable time, because that was the time originally fixed by the contract, which was predicated upon the idea that there was no obstacle.

*44]

---

But yet no title could be acquired, without such a settlement, and if men were found hardy enough to brave the dangers of a savage wilderness, they might be called imprudent men, but they would also deserve the promised reward, not for their boldness, but for their settlement.

The first evidence we have of an intention in the plaintiff to make an actual settlement, was in the spring of 1796, long after the actual *bona fide* settlement of the defendant with his family, for I give no credit to the notice from the plaintiff to the defendant in July 1795, since, so far from accompanying it with actual settlement, he speaks of a future settlement which, however, was never carried into execution.  Everything which I have said with respect to the 400 acres surveyed in the name of George Balfour, will apply *à fortiori* against the three other surveys in the name of Elizabeth Balfour, &c., who, it is not pretended, were ever privy even to the making of the cabins, or ever contemplated a settlement upon those lands.

If the law, then, had stopped at the proviso, it is clear, that the plaintiff never made such a settlement as would entitle him to a warrant.  But he excuses himself from having made such a settlement as the law required, by urging the danger to which any person attempting a residence in that country would have been exposed.  He relies on the proviso to the ninth section of the law, which declares, "that if any such actual settler, or any grantee in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have and to hold the said lands, in the same manner as if each actual settlement had been made and continued."  Evidence has been given of the hostile state of that country, during the years 1793, 1794, 1795, and the danger to which settlers would have been exposed.  We know that the treaty at Fort Grenville was signed on the 3d of August 1795, and ratified the 22d of December in the same year: although Meade settled with his family, in November 1795, it is not conclusive proof that there was no danger even then, and at any rate, it would require some little time and preparation, for those who had been driven off, to return to their settlements, and if the cause turned upon the question whether the plaintiff had persevered in his exertions to return and make such settlement as the law requires, I should leave that question to the jury, upon the evidence they have heard.  But the plaintiff, to entitle himself to the benefit of the proviso, should have had an incipient title, at some time or other, and this could only have been created by actual settlement, preceding the necessity which obliges him to seek the benefit of the proviso, or by warrant.

I do not mean to say, that he must have had such an actual settlement as this section requires, to give a perfect title; for if he had built a cabin, and commenced his improvement, in such manner as to afford evidence of a *bona fide* intention to reside, and had been forced off by the enemy, at any stage of his labors, persevering, at all proper times afterwards, in endeavors to return, when he might safely do so, he would have been saved by the proviso.  But it is incumbent on the plaintiff, if he would excuse himself from the performance of what has been correctly called a condition precedent, to bring himself fully and fairly within the proviso which was made for his benefit; this he has not done.

Decisions in the supreme court and in the common pleas of this state have been cited at the bar, two of which I shall notice, for the purpose of pointing out the peculiar mark which distinguishes them from the present, and to prevent any conclusions from being drawn from what has been said either to countenance or impeach those decis-

Huidekoper v. Douglass.

*But it is said, that the commonwealth alone can enter for the forfeit-ure, and that there is no private right of entry.  But if this is a con-dition precedent, no right ever vested, and therefore, there can be no for-feiture.  The *only right given was a permission within two years [*46 to enter, for the purpose of surveying and settling ; but this right

---

ions.  The cases I allude to are The Holland Company v. Coxe,[1] and the feigned issue tried at Sunbury.[2]

The incipient title under which the plaintiffs claimed in those causes were warrants authorized by the third section of the law.  The incipient title in the present case is settlement.  The former was to be completed by settlement, survey and patent; this to precede the warrant ; and for the most distinct explanation of this distinction, it will be important to ascertain what acts will constitute an actual settler to whom a warrant may issue, and what constitute an actual settlement as the foundation of a title.  I have before explained who may be an actual settler to demand a warrant, namely, one who has gone upon and occupied land with a bonâ fide intention of an actual present resi-dence, although he should have been compelled to abandon his settlement by the pub-lic enemies, in the first stages of his settlement; but actual settlement, intended by the 9th section, consists in clearing, fencing and cultivating two acres of ground at least on each one hundred acres, erecting a house thereon, fit for the habitation of man, and a residence continued for five years next following his first settling, if he shall so long live.  This kind of settlement more properly deserves the name of improvements, as the different acts to be performed clearly import.  This will satisfactorily explain what at first appeared to be an absurdity in that part of the proviso which declares that " if such actual settler shall be prevented from making such actual settlement," &c., the plain meaning is, that if a person has once occupied land with an intention of residing, though he has neither cleared nor fenced any land, and is forced off by the enemies of the United States, before he could make the improvements, and continue thereon for five years ; having once had an incipient title, he shall be excused by the necessity which prevented his doing what the law required, and in the manner required ; or if the warrant-holder, who likewise has an incipient title, although he never put his foot upon the land, shall be prevented by the same cause from making these improvements, &c., he too shall be excused if, as is required also of the settler, he has persevered in his endeavors to make those improvements, &c.  But what it becomes such grantee to do before he can claim a patent, or even a good title, is quite another question, upon which I give no opinion.

As to the plaintiff's surveys and warrants, they cannot give him a title.  Not the surveys ; 1st.  Because they are a mere description of the land which the surveyor is authorized by the eighth section to make, and the applicant for the warrant is directed by the third section to lodge in the land-office at the time he applies for the warrant. It is merely a demarcation, a special location of the land intended to be appropriated, and gives notice of the bounds thereof, that others may be able to make adjoining loca-tions, without danger of interference ; this is not such a survey as is returnable so as to lay the foundation of a patent ; 2d.  It is not authorized by a warrant ; 3d.  It was not for an actual settler ; 4th.  It was not made by an authorized surveyor, if you believe, upon the evidence, that the authority to Steel was ante-dated, and given after the survey was returned.  Not the warrant ; 1st.  Because it was not a warrant of title, but of ac-ceptance ; 2d.  It is not founded on settlement, but improvement, and if it had recited the consideration to be actual settlement, the recital would have been false in fact, and could have produced no legal valid consequence.

As to the caveat ; the effect of it was to close the doors of the land-office against the further progress of the plaintiff in perfecting his title.  The dismissal of it again opened the door, but still the question as to the title is open for examination in eject-ment, if brought within six months, and the patent will issue to the successful party.

[1] 4 Dall. 171.                    [2] Ibid. 237.

31

expired with the two years after the date of the warrant, or of the close of the war. *The land is to be granted to other actual settlers ; this term is explained in the 5th and 10th sections, and means those who were actually on the land and had begun their settlement. The commonwealth could not grant these lands to actual settlers, unless there was *a private right of entry, for there cannot be actual settlement, without actual entry. These expressions of the act imply as complete a right of entry as a warrant itself. By the act of the 22d of April 1794, vol. 3, p. 581, 636, no warrant can be obtained for unimproved lands. There must be a previous actual settlement.

*It is not necessary that any act should be done on the part of the commonwealth, because there is no title to be defeated. But if she is bound to do any act, the act of the actual settler is her authorized act. He cannot be a trespasser, because the land was vacant. *By the 15th section of the act, certain holders of warrants theretofore granted are authorized to locate them in any district of vacant land in the state, provided that the owners of such warrants " shall be under the same regulations and restrictions, as other owners of warrants taken for lands lying north and west of the Allegheny river and Conewango creek are made subject by this act ;" that is, they are to make their settlement in two years from the date of their warrants, although their warrants were more than two years old when the act *passed. This can only be done by giving a construction to this section similar to that which we contend ought to be given to the 9th.

*W. Tilghman*, on the same side.—The treasury of Pennsylvania was overflowing by the sales of lands between 1784 and 1792. The utmost that has been received from the sale of the lands under the act of 1792, including the tract called the triangle, is $500,000.

There are two descriptions of persons contemplated by the act. 1st. The moneyed man who could procure settlers ; and 2d. The hardy but poor actual settler, who was to have a credit of ten years for his purchase-money. The state did not want money, but a barrier. Population, and not revenue, was the object. The actual settlement of the land was the *sine qua non* *of the contract. This appears from the whole tenor of the act itself, as well as from the general circumstances and policy of the state.

The term actual settler has two different significations, as used in the act. But there can be no settlement, without actual personal residence. An actual settler sometimes means a person who is on the land, with an intent to remain, and sometimes it means fencing, clearing, cultivating, building and residing five years. By the act of the 30th December 1786, vol. 2, p. 488, it is declared, " that by a settlement shall be understood an actual, personal, resident settlement, with a manifest intention of making it a place of abode, and the means of supporting a family, and continued from time to

---

The plaintiff, therefore, having failed to show a title sufficient to enable him to recover in this action, it is unnecessary to say any thing about the defendant's title, and your verdict ought to be for the defendant.[1]

The jury found for the defendant.

[1] See also, Huidekoper *v.* Douglass, 1 W. C. C. 109 ; and Huidekoper *v.* McLean, Id. 136.

Huidekoper v. Douglass.

time, unless interrupted by the enemy, or by going on the military service of this country during the war." Thus, the word settlement, in the 8th section, is used in its common acceptation. It is merely the inception of title ; but the settlement mentioned in the 9th section is the completion of title. The 9th section was intended to define more exactly what kind of settlement should vest a title.

There being, then, no settlement without residence, and no time of residence prescribed, except the five years, if there has not been such a residence, there has been no residence, and if no residence, no settlement. Settlement, therefore, includes both improvement and residence.

Every tract of 400 acres was to be specifically settled. The misfortune of the Holland Company was, that they undertook an impossibility. They had engaged to settle 1162 tracts in two years. The words " in default," &c., show that settlement was the main object. It is improbable, that the proviso should be intended totally to defeat the great object of actual settlement ; and yet that would be its effect, if the war should continue for two years, which, at the time of passing the act, was a very probable event.

*Much reliance has been placed on the words, " as if ;" yet, on our construction, we allow them their full effect. The settlement was to [*53 be made in two years ; but, says the proviso, if you shall be prevented from making it within two years, and persist until it be accomplished, you shall hold the land *as if* it had been made within the two years according to the enacting clause. But if persisting two years in time of war gives a complete title, the proviso gives the purchaser in time of war better terms than the enacting clause gives to a purchaser in time of peace. For the latter is obliged to settle and reside five years, while the former gets the land without any such condition.

But, say they, the proviso operates in favor of those only who have been prevented from improving. Suppose, a man has improved, but is driven away before the end of his five years' residence : upon their construction, he would lose his land, while that of the man who has done nothing, would be saved. We admit, that persistence is not required during the war ; for it would be idle to impose unavailing efforts ; and the question, what is persistence ? would open a door to endless litigation. One jury would decide one way and another the contrary. The persisting is to begin when the war ceases. If actual settlement means only improvement, it would be absurd to say, made and continued. The word continued cannot apply to a thing which, when once done, is done for ever. There was the same reason for settlement after the war, as during its existence.

*Ingersoll*, in reply.—Three questions arise in this case. 1st. Are endeavors persisted in, accepted by the act as a substitute for actual settlement and residence ? *2d. For what period must those endeavors be continued, so as to operate as a dispensation with the condition, and amount to [*54 such substitute ? 3d. If a forfeiture has been incurred, who is to take advantage of it ? actual settlers, or the commonwealth ?

1st. Does the act contemplate a persistence in endeavors as a substitute for actual settlement and residence? It may be necessary first to ascertain the meaning of the words improvement, settlement and residence, both in their general import, and in the appropriate sense in which they are used in

3 CRANCH—3                                                          33

Huidekoper v. Douglass.

the act of 1792. By improvement is understood clearing, cultivating or building on lands previously unappropriated. In degree, it is infinitely various, from the blazing of a tree with a tomahawk to the highest degree of cultivation. The first improver has generally been favored in Pennsylvania. But by the present act, he has no preference, except in certain specified cases. Improvement and settlement are not convertible terms. There may be improvement, without settlement, but there cannot be settlement, without improvement. Settlement, in the order of things, is subsequent to improvement, and includes it. It signifies a place on which a person lives, after having made an improvement, with or without his family. Whenever the residence commences, the settlement is computed from the time that the improvement was first tenanted.

The act of assembly adopts words of a previously ascertained import. Warrant, survey, improvement and settlement were an inception of, and gave to the warrantee, a defeasible title. The patents were not to issue until after five years' residence, when the right was complete and indefeasible. Payment of the purchase-money, warrant and survey, gave a defeasible title, *55] inchoate and possessory. This *right, whatever it was, was liable to forfeiture by a non-compliance with the terms of the act. Residence is a continued settlement. Improvement, as described in the act, settlement and residence for five years next following the first settlement, were conditions precedent, not to a possessory, but to an absolute title, unless prevention by war should furnish an excuse. That improvement, settlement and residence are used in the act as successive and distinct terms, is evident from the act itself. The 5th section speaks of land settled and improved; the 7th, of actual settlement and improvement; and the 9th, of actual settlement and residence; and of actual settlement made and continued. The settlement, including such an improvement as is described in the law, is to commence within two years from the date of the warrant. The residence for five years is to commence from the first settling. Hence, residence is a continuation of settlement, not a constituent part of it.

It it true, that the legislature, when declaring by what means a settlement shall be made, have included a residence of five years, but the absurdity of including a residence of five years, in a settlement to be made in two years, evidently shows that they have admitted an error in their language. It is clear, that they do not mean what they say, and the question is, what did they mean to say? To make the least possible alteration in the words, so as to express their meaning, is to substitute the future tense for the participle; "shall reside," instead of "residing." This removes all the difficulties of the language, and throws great light upon the whole act. The sentence will then read thus: "no warrant shall vest any title in the lands, unless the grantee shall, within two years from the date of such warrant, make an actual settlement thereon, by clearing, fencing and cultivating at least two acres for every hundred, erecting thereon a messuage for the habitation of man, and shall reside thereon for the space of five years next following his first settling of the same." If, then, the word "residing" be rejected for *56] its substitute "shall reside," *there is nothing in the act to justify the proposition that settlement includes five years' residence. There is not another word in the whole act which can suggest such an idea; on the contrary, there are many expressions totally repugnant to the supposition.

34

Huidekoper v. Douglass.

Having thus endeavored to ascertain the meaning of the terms improvement, settlement and residence, let us consider the meaning of the proviso. We contend, that if the grantee has, by force of arms of the enemies of the United States, been prevented from making an actual settlement, within two years after the date of his warrant, having during that time persisted in his endeavors to make such settlement, such persistence, though ineffectual, is accepted as a substitute for actual settlement and residence.

We admit, that it was with a hope that hardy adventurers would effect an establishment reaching from the Ohio to Lake Erie, and cut off the intercourse between the northern and the western Indians, that the assembly of Pennsylvania passed the law in question. It was at a time when the President of the United States was preparing to hold a treaty of peace with the western Indians, at Detroit; and in the same session, they authorized the employment of a military force to aid and strengthen those who were exposed on the frontiers. We agree, that it was to encourage the immediate actual residence of bold but poor men, that the legislature required no purchase-money for ten years from such as placed themselves upon the lands and began settlements. To this description of adventurers, they gave a further security, by protecting them against all warrants not entered in the books of the surveyor of the district, at the time the settler fixed himself on the land. From such as inclined to pay money, and operate by placing tenants on the land, and giving such tenants bounties for settling, they required a prompt co-operation with the actual settlers, in accomplishing the great undertaking.

Let it be recollected, that the person who claimed by actual settlement could hold but one tract, the warrant-holder as many as he could pay for, using only different *names which is perfectly known to be but matter of form. The warrantees were obliged to place a settler on each [*57 tract, within two years from the date of the warrant, if there should be peace, and at all events, to be ready, and make the attempt, to support the settlers, if the war should continue. Thus they made it the interest of both descriptions, operators with money, and operators with labor, to make a joint and steady effort for two years to realize the expectations formed of this new barrier.

Here it may not be improper to remind the court, that, as the law of Pennsylvania then stood, any alien might purchase and hold land in that state. It has been said, that the act was not intended to give an opportunity for speculation; it was certainly intended that foreigners should buy any quantity of land, to the extent of their means of payment. We do not wish to treat this subject technically; but from the very nature of the property, and the condition as expressed in the law, the grantee has a right to enter upon the land, maintain suits for its recovery or defence, take the profits, alienate, mortgage it, bind it by suffering judgments, transmit it to heirs, subject only to the conditions of the original grant.

Suppose, there had been no proviso; take the enacting clause of the section absolutely by itself, what would be the condition of the holders of warrants dated in 1792 and 1793? The warrantee might enter, nay, he was bound to enter, by the nature of his grant; the public enemy prevents him; the state and the United States are unable to protect him; without any *laches* in him, the performance of the condition becomes impossible, by the

35.

act of the public enemy. Would the common law say that the estate should be lost? Are not these conditions what the law terms subsequent? If precedent, no interest could arise. The warrantee could exert no act of ownership, until the *conditions were all performed. Here, his performance depends upons his being exclusively the possessor and owner.

*58]

In one sense of the word, all conditions are precedent; that is, they ought to be performed, before the estate becomes absolute; but in law, those only are termed precedent which must be performed before the grantee can enter upon the estate or recover at law. Conditions subsequent refer to cases where the party may immediately take and enjoy the grant, but perform afterwards, having, in the meantime, a qualified title, and the right of possession. Is it not a settled and a reasonable rule, that conditions tending to defeat an estate, once qualifiedly vested, shall be construed strictly? and also, that courts will hold a condition to be either precedent or subsequent, according to the intent of the party creating it, whatever be the form of words, and when the same words may constitute either the one or the other, according to the nature of the case? We are to show that there is a substitute for actual performance; what that substitute is, will be a subject of inquiry under the 2d head.

The legislature considered two years as a reasonable time after the date of the warrant, in which to complete the specified improvements in a season. of peace. A distant wilderness was to be explored, provisions to be collected and transported; clearing, cultivating and building, where laborers were scarce, were difficult and of slow progress. Actual settlement within two years was of indispensable necessity, in order to obtain full title, unless prevented by the enemies of the United States. The question then offered itself to the legislature, shall the continuance of the war release the condition and endeavors be equivalent to performance?

*59]

*We contend, that the principle of the proviso is, that if the warrantee does what he can, according to circumstances, he shall not be injured on account of the war, nor thereby be delayed in the acquisition of his title. The price of the lands, and the terms of purchase, were fixed upon the basis of peace. Twenty dollars per hundred acres, with the condition of settlement and residence, was a full consideration in a time of peace. The legislature could not expect to get better terms in a time of war. As the price was to be the same in war and peace, the modification must be in the terms of the condition of settlement and residence.

If, with the same price, you exact similar conditions of settlement and residence, at an indefinite distance of time, and after an intervening war, during the whole of which you require a constant persistence in endeavors to make such settlement, you, in effect, increase, you double or multiply the sum to be paid as the consideration of the land; and in addition to the original terms of price, settlement and residence, you gain the use of the money, and the co-operation of individuals in forming that barrier, which was one of the great objects of the act; the purchaser loses both the interest of his money and the use of his land. It is impossible, therefore, to require endeavors during, and accomplishment after, the war, and yet say, that the purchaser does not pay a higher price for the land on account of the war.

It becomes important to consider, whether the endeavors were to be

*Huidekoper v. Douglass.*

persisted in during the war ; for we have been lately told, for the first time, that persist means desist during the war, and after the war, it again means persist. It is admitted, that a frontier of hardy inhabitants to oppose against the incursions of the savage enemy was a leading consideration with the legislature ; it was natural for them to wish attempts to settle might be made during the war. It was acknowledged to be *unreasonable, [*60 that the hazardous experiment should be made at the expense of the adventurers. The event was doubtful : hopes of success were, however, entertained. The law contemplated the disposal of two millions of acres. What number of persons might be induced to share in its undertaking, was uncertain. But the words of the act admit of no doubt, that the persisting was to be in a time of war. If the grantee shall be prevented by the enemy, and shall persist in his endeavors ; that is, in his endeavors to surmount the obstacle which prevented the settlement, namely, the force of arms of the enemies of the United States, then, &c.

2d. What is the period of time, during which the endeavors were to be continued, in order to effect a release of the condition, and amount to a substitute for performance ? As two years from the date of the warrant was the time in which the settlement was to be made, if there had been no prevention, we say, that perseverance in endeavors, during the same period, in a time of war, was all which the legislature required : Because, without the proviso, the estate of the grantee would then have become absolute, at common law, and the proviso, being for the benefit of the grantee, shall not place him in a worse situation than if it had not been inserted : Because, to adopt the principle which is urged against us, that we ought to commence in a reasonable time after the removal of the force, is worse than forfeiture, as it introduces infinite confusion and endless controversy : Because, taking possession, clearing, fencing, cultivating and building, are nowhere in the law required of the warrantee, after two years from the date of the warrant, and persistence must relate to the act of taking and maintaining possession : *Because, the law does not provide for cases of interruption [*61 by war, for more than two years ; and to require longer efforts would be lengthening the persistence to the end of the war, and five years afterwards ; which would be inconsistent with the last clause of the proviso, giving absolute estates after certain persistance had failed : And because, if the persistance had been construed to be indefinite, no man of any prudence among ourselves, and no foreigner or individual would have advanced a dollar on those lands. No man could, on that idea, conjecture when he might get a title ; the war might continue ten years ; the country might be restored to the Indians for a stipulated time ; or setttlements might have been prohibited by the United States ; and in all these events, the purchaser would have lost his money and labor.

The legislature departed from the common law, in requiring a persistence during the war. For what purpose ? To carry a favorite point. An establishment of settlers from Presqu' Isle to the Ohio. What do they promise for this extra requisition ? An absolute title, if the exertions for two years should be ineffectual. But he is to "persist in his endeavors to make such actual settlement *as aforesaid ;*" that is, within two years from the date of the warrant. No other kind of settlement, and no other time is prescribed. But he could not persist to make such actual settlement within

two years from the date of the warrant, after those two years had expired; and a settlement made after the two years could not have availed.

3d. If the persistence must be for more than two years, when will it end? Where is the term at which the legislature has said the estate shall become absolute? If the grantee get possession, at the end of the five years, must he go still further and reside five years? There can be no pretence for persisting five years, because, without a settlement made, there is no epoch from which the five years are to begin to run; and there can be no settlement made but within two years from the date of the warrant. *If no settlement within the two years, no question can ever arise respecting the five years.

*62]

4th. If the proviso has any meaning different from the common law, respecting force of arms of a public enemy, it certainly means to impose a new duty upon the grantee, and to give him an equivalent. What was the new duty? Persistence for two years, whether the country was at peace or war. What was the equivalent? Substitution of ineffectual, though sincere persistance in endeavors, for actual settlement. What was the motive for this departure from the common law? A sanguine hope of removing the enemy to a great distance from our old settlements, by blocking up the pass through which they so easily entered. With this construction of the act, every proceeding of the state, and of the grantees, will perfectly harmonize.

But if the meaning be doubtful, and resort should be had to the common law, such a construction would be made as might confirm the estate, and quiet a *bonâ fide* purchaser; and no construction could possibly be adopted, which would repeal such an express stipulation in favor of the grantee, as is contained in the last clause of the proviso.

5th. If a forfeiture has been incurred, or if the title has reverted to the state, by the default of the grantee, by whom can advantage be taken? By individuals, or by the state, and in what method? We contend, by the state only. And we rely upon general principles; on the reason and convenience of the thing; on the express provisions of the legislature, and on the decisions of the state judges, without a dissentient voice, or the expression of a doubt. If any individual may enter upon the tenant of the Holland Company, whenever he shall choose to say that *the settlement is not completed in due time, they may be dispossessed of every foot of land they have taken up. Numbers and strength are against them.

*63]

It is a general principle of law, that the commonwealth can only take by inquest of office, of entitling, or of instruction. The title of the sovereign must appear on record. This rule is founded in good sense and propriety, and is enforced, in this instance, by a further rule, that whoever comes into possession with title, or by law, shall not be dispossessed without process. If uninformed individuals, under the influence of bias and passion, are to decide the question of forfeiture, and to enter on the lands, at their discretion, stay as long as they please, before they apply for a warrant, and so in succession, upon the idea either of forfeiture or failure in persistence in endeavors to settle, innumerable mischiefs and endless confusion will indeed ensue. The legislature foresaw the great inconveniences that would result from constituting every needy adventurer a judge of their meaning in this law, and have, therefore, marked out the mode in which advantage shall be taken

Huidekoper v. Douglass.

of a default in the grantee, by providing that, in default of actual settlement and residence, the commonwealth may grant new warrants to other actual settlers. The commonwealth, therefore, is to be satisfied, in the first place, that the default has been made, and in the second place, that the applicant is such an actual settler as may purchase, and in the third place, a warrant must issue to the applicant, before he can have any right to enter.

By the terms other actual settlers, the legislature meant persons who were willing to come under engagements to settle; persons who will purchase the land, subject to the condition of settlement; or, in the language of the second section of the act, "who will cultivate, improve and settle the same," not who have cultivated, improved and settled; or, in the language of the 3d section, "who are desirous to settle and improve."

*Lewis, on the same side.—The proviso does not relate to the residence. A settlement may be made and not continued. If a man [*64 has completed his settlement, and is driven off by the enemy, before he has finished the five years' residence, we say, the residence is dispensed with; for he is only to persist in endeavors to make the settlement; and if the settlement is already made, he cannot be required to persist in his endeavors to make it. That part of the proviso, therefore, relative to persistence, does not apply to him who has finished his settlement. The proviso, as to him, will read thus: that if such actual settler shall be driven from his settlement, he shall be entitled to hold in the same manner as if the settlement had been continued. Our construction, therefore, does not involve the consequence which gentlemen have supposed.

There is a passage of the act which has not been noticed, and which strongly implies that residence is not included in settlement. It is this: "And that in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth to issue new warrants to other actual settlers, for the said lands, or any part thereof, reciting the original warrants, and that actual settlements and residence have not been made in pursuance thereof, and so as often as defaults shall be made." If settlement includes the five years' residence, then an actual settler is a person who has made an actual settlement by clearing, fencing, cultivating, building and residing five years on the land. If, on default, the commonwealth is to grant the land to such an actual settler only, there never can be but one default, because the second warrantee will have complied with all the requisites for a full and absolute title before the warrant is granted. The words, "and so as often as defaults shall be made," would, in such case, be nugatory and nonsensical.

No argument can be drawn from the 15th section; for it does not follow, that because one section requires a particular construction, different words, relative to a different subject in another section, must have a similar construction. It only shows, what we all agree is the fact, that the act is very inaccurately drawn, and cannot be understood according to its strict letter.

*Wednesday, February 27th, 1805, MARSHALL, Ch. J., delivered [*65 the opinion of the court as follows:—

The questions which occurred in this case, in the circuit court of Pennsylvania, and on which the opinion of this court is required, grow out of the act passed by the legislature of that state, entitled "an act for the sale of

the vacant lands within this commonwealth." The 9th section of that act, on which the case principally depends, is in these words, " and be it further enacted," &c.

The questions to be considered, relate particularly to the proviso of this section; but to construe that correctly, it will be necessary to understand the enacting clause, which states what is to be performed by the purchaser of a warrant, before the title to the lands described therein shall vest in him.

Two classes of purchasers are contemplated. The one has already performed every condition of the sale, and is about to pay the consideration-money; the other pays the consideration-money, in the first instance, and is afterwards to perform the conditions. They are both described in the same sentence, and from each an actual settlement is required as indispensable to the completion of the title.

In describing this actual settlement, it is declared, that it shall be made, in the case of a warrant previously granted, within two years next after the date of such warrant, " by clearing, fencing and cultivating at least two acres for every hundred acres contained in one survey, erecting thereon a messuage for the habitation of man, and residing, or causing a family to reside thereon for the space of five years next following his first settling of the same, if he or she shall so long live."

*66]     *The manifest impossibility of completing a residence of five years, within the space of two years, would lead to an opinion, that the part of the description relative to residence, applied to those only who had performed the condition, before the payment of the purchase-money; and not to those who were to perform it afterwards. But there are subsequent parts of the act which will not admit of this construction, and consequently, residence is a condition required from the person who settles under a warrant, as well as from one who entitles himself to a warrant by his settlement.

The law requiring two repugnant and incompatible things, is incapable of receiving a literal construction, and must sustain some change of language to be rendered intelligible. This change, however, ought to be as small as possible, and with a view to the sense of the legislature, as manifested by themselves. The reading, suggested by the counsel for the plaintiff, appears to be most reasonable, and to comport best with the general language of the section, and with the nature of the subject. It is by changing the participle into the future tense of the verb, and instead of " and residing, or causing a family to reside thereon," reading " and shall reside," &c. The effect of this correction of language will be to destroy the repugnancy which exists in the act as it stands, and to reconcile this part of the sentence to that which immediately follows, and which absolutely demonstrates that in the view of the legislature, the settlement and the residence consequent thereon, were distinct parts of the condition; the settlement to be made within the space of two years from the date of the warrant, and the residence in five years from the commencement of the settlement.

This construction is the more necessary, because the very words " such actual settlement and residence," which prove that residence is required from the warrantee, prove also that settlement and residence are, in contemplation of the law, distinct operations. In the nature of things, and from the usual import of words, they are also distinct. To make a *settlement, no more requires a residence of five, than a residence of five hundred

*67]

years ; and, of consequence, it is much more reasonable to understand the legislature as requiring the residence for that term, in addition to a settlement, than as declaring it to be a component part of a settlement.

The meaning of the terms settlement and residence being understood, the court will proceed to consider the proviso. That part of the act treats of an actual settler (under which term is intended as well the person who makes his settlement the foundation of his claim to a warrant, as a warrantee who had made an actual settlement in performance of the conditions annexed to his purchase), and of "any grantee in any such original or succeeding warrant ;" who must be considered as contradistinguished from one who had made an actual settlement. Persons thus distinctly circumstanced, are brought together in the same sentence, and terms are used appropriate to the situation of each, but not applicable to both. Thus, the idea of "an actual settler," "prevented from making an actual settlement," and after "being driven therefrom," "persisting in his endeavors" to make it, would be absurd. To apply to each class of purchasers all parts of the proviso, would involve a contradiction in terms. Under such circumstances, the plain and natural mode of construing the act, is, to apply the provisions distributively to the description of persons to whom they are adapted, *reddendo singula singulis*. The proviso then would read thus : " Provided always, nevertheless, that if any such actual settler shall be driven from his settlement, by force of arms of the enemies of the United States ; or any grantee, in any such original or succeeding warrant, shall by force of arms of the enemies of the United States, be prevented from making such actual settlement, and shall persist in his endeavors to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have and to hold the said lands, in the *same manner as if the actual settlement had been made and continued. [*68

The two cases are, the actual settler, who has been driven from his settlement, and the warrantee, who has been prevented from making a settlement, but has persisted in his endeavors to make one. It is perfectly clear, that in each case, the proviso substitutes something for the settlement to be made within two years from the date of the warrant, and for the residence to continue five years from the commencement of the settlement, both of which were required in the enacting clause. What is that something? The proviso answers, that in the case of an "actual settler," it is his being " driven from his settlement by force of arms of the enemies of the United States," and in case of his being a grantee of a warrant, not having settled, it is " persisting in his endeavors to make such actual settlement." In neither case, is residence, or persisting in his endeavors at residence, required. Yet the legislature had not forgotten, that by the enacting clause, residence was to be added to settlement ; for in the same sentence, they say, that the person who comes within the proviso shall hold the land, " as if the actual settlement had been made and continued."

It is contended, on the part of the defendant, that as the time during which persistence shall continue is not prescribed, the person claiming the land must persist until he shall have effected both his settlement and residence, as required by the enacting clause of the act. That is, that the proviso dispenses with the time, and only with the time, during which the con-

Huidekoper v. Douglass.

dition is to be performed. But the words are not only inapt for the expression of such an intent ; they absolutely contradict it.

*69]    *If the proviso be read so as to be intelligible, it requires nothing from the actual settler who has been driven from his settlement. He is not to persist in his endeavors at residence, or, in other words, to continue his settlement, but is to hold the land. From the warrantee who has been prevented from making a settlement, no endeavors at residence are required. He is to " persist in his endeavors," not to make and to continue such actual settlement, but " to make such actual settlement as aforesaid." And if he does persist in those endeavors, he is to hold the land, " as if the actual settlement had been made and continued." The construction of the defendant would make the legislature say, in substance, that if the warrantee shall persist in endeavoring to accomplish a particular object, until he does accomplish it, he should hold the land, as if he had accomplished it. But independent of the improbability that the intention to dispense only with the time in which the condition was to be performed, would be expressed in the language which has been noticed, there are terms used, which seem to restrict the time during which a persistence in endeavors is required. The warrantee is to persist in his endeavors " to make such actual settlement as aforesaid." Now, " such actual settlement as aforesaid," is an actual settlement within two years from the date of the warrant. As it could only be made within two years, a persistence in endeavoring to make it, could only continue for that time.

If, after being prevented from making an actual settlement and persisting in endeavors, those endeavors should be successful, within the two years after which the person should be driven off, it is asked, what would be his situation ? The answer is a plain one. By persisting, he has become an actual settler ; and the part of the proviso which applies to actual settlers protects him. If, after the two years, he should be driven off, he is still protected. The application of external violence dispenses with residence.

*70]    The court feels itself bound *to say so, because the proviso contains a substitute, which, in such a state of things, shall be received instead of a performance of the conditions required by the enacting clause ; and of that substitute, residence forms no part.

In a great variety of forms, and with great strength, it has been argued, that the settlement of the country was the great object of the act ; and that the construction of the plaintiff would defeat that object. That the exclusive object of an act to give lands to settlers, would be the settlement of a country, will be admitted ; but that an act to sell lands to settlers, must have for its exclusive object the settlement of the country, cannot be so readily conceded. In attempting to procure settlements, the treasury was certainly not forgotten. How far those two objects might be consulted, or how far the one yielded to the other, is only to be inferred, from the words in which the legislative intention had been expressed. How far the legislature may have supposed the peopling of the district in question to have been promoted by encouraging actual settlements, though a subsequent residence on them should be rendered impracticable by a foreign enemy, can only be shown by their own language. At any rate, if the legislature has used words, dispensing with residence, it is not for the court to say, they could not intend it, unless there were concomitant expression, which should explain those words in a manner different from their ordinary import.

42

There are other considerations in favor of the construction to which the court is inclined. This is a contract; and although a state is a party, it ought to be construed according to those well-established principles which regulate contracts generally. The state is in the situation of a person who holds forth to the world the conditions on which he is willing to sell his property. *If he should couch his propositions in such ambiguous [\*71 terms, that they might be understood differently, in consequence of which sales were to be made, and the purchase-money paid, he would come with an ill grace into court, to insist on a latent and obscure meaning, which should give him back his property, and permit him to retain the purchase-money. All those principles of equity, and of fair dealing, which constitute the basis of judicial proceedings, require that courts should lean against such a construction.

It being understood that the opinion of the court on the two first questions, has rendered a decision of the third unnecessary, no determination respecting it has been made.

It is directed, that the following opinion be certified to the circuit court.

CERTIFICATE OF THE OPINION.—1st. That it is the opinion of this court, that under the act of the legislature of Pennsylvania, passed the 3d day of April, A. D. 1792, entitled "an act for the sale of the vacant lands within this commonwealth," the grantee, by a warrant of a tract of land lying north and west of the rivers Ohio and Allegheny and Conewango creek, who, by force of arms of the enemies of the United States, was prevented from settling and improving the said land, and from residing thereon from the 10th of April 1793, the date of the said warrant, until the 1st of January 1796 ; but who, during the said period persisted in his endeavors to make such settlement and residence, is excused from making such actual settlement as the enacting clause of the 9th section of the said law prescribes to vest a title in the said grantee.

2d. That it is the opinion of this court, that a warrant of a tract of land lying north and west of the rivers Ohio and Allegheny and Conewango creek, granted in the year 1793, under and by virtue of an act of the legislature of Pennsylvania, entitled "an act for selling the vacant lands in this commonwealth," to a person, who, by force of arms of the enemies of the United States, was *prevented from settling and improving the said [\*72 land, and from residing thereon from the date of the said warrant until the 1st of January 1796, but who, during the said period, persisted in his endeavors to make such settlement and residence, vests in such grantee a fee-simple in the said land, although, after the said prevention ceased, he did not commence, and, within the space of two years thereafter, clear, fence and cultivate at least two acres for every hundred acres contained in his survey for the said land, and erect thereon a messuage for the habitation of man, and reside, or cause a family to reside thereon, for the space of five years next following his first settling of the same, the said grantee being yet in full life.[1]

---

[1] The case was subsequently tried in the circuit court on these principles, and resulted in a verdict in favor of the plaintiff. 4 Dall. 392; 1 W. C. C. 258. Thus establishing the validity of the title of the Holland Land Company.

Huidekoper v. Douglass.

JOHNSON, J.—I concur in the decision given by the court in this case; but there was a question suggested and commented on in the argument, which has not been noticed by the court, but which appears to me to merit some consideration.

It was inquired by the counsel for the defendant, should the court adopt the principle that persistence for two years is to be substituted for an actual settlement and residence, what is to be the effect of a partial prevention? Is the warrantee to be subjected to the necessity of making good his settlement, should the prevention cease or commence at any point of time during the two years, without any, or under what, limitation?

It is undoubtedly true, that any construction of a statute which will produce absurdities, or consequences in direct violation of its own provisions, is to be avoided. It were better not to depart from their literal signification, than to involve consequences so inconsistent with the nature and very idea of legislation. But it does not appear to me, that any embarrassment will attend the construction of this act which the court has adopted; that the case of a partial duration of the existence of the preventing cause is not within the view of the proviso; that it is not excepted from the operation of the enacting clause. It would be absurd, to impose upon the warrantee the necessity of performing in a few months, perhaps, at the most inconvenient season of the year, a condition for which the act proposes to hold out to him an indulgence *of two years; when prevented too by a cause not within his control, and against which the state was bound to protect him. If such were the case now before the court, I should be of opinion, that we must resort to general principles for a decision. With regard to the performance of conditions, it is a well-known rule, that obstructions interposed by the act of God, or a public enemy, shall excuse from performance, so far as the effect of such preventing cause necessarily extends.

In cases of partial prevention, I should, therefore, be of opinion, that it would be incumbent upon the warrantee to satisfy the court that he had complied with the conditions imposed by the act, so far as he was not necessarily prevented by the public enemy.

It may appear singular, that a deficiency of a single day, perhaps, should produce so material an alteration in the rights or situation of the warrantee. But the legislature of Pennsylvania were fully competent to make what statutory provisions they thought proper upon the subject; and the court is no further responsible for the effect of the words which they have used to express their intent, than to endeavor to give a sensible and consistent operation to them, in every case that can occur.