## Leasure *against* Wilson.

Where the warrantee of a tract of land north and west of the rivers Ohio, &c. has failed to make a settlement and improvement within the time required by the act of the 3d of April 1792, and an actual settler, entering without a vacating warrant, made the improvements required by that act, continued in possession until 1817, and in other respects did all that was required to obtain a title under the commonwealth, but for a time had left the possession, it is held that there was no implication of a contract between the settler and the warrantee, or an equity arising out of these circumstances, which would in any manner entitle the settler to recover any part of the land.

ERROR to the common pleas of *Butler* county.

This was an ejectment in which the defendant in error, William Wilson, was the plaintiff below. The case was brought up on the charge of the court, which was as follows (Shaler, president) :

"The principle involved in this case is one of so much magnitude, that the brief time allotted to the preparation of a charge will not enable me to present those views of it to the jury which are necessary to illustrate it fully.

"The case of Skeer and Pearce—in which it was decided, after solemn argument, that an actual settler upon warranted lands, subject to forfeiture for a breach of the condition of actual settlement, could not maintain his title by settlement, against the warrantee, who had made default, without first procuring a vacating warrant before his entry, although the issuing of any warrants, except to actual settlers, was prohibited by act of assembly—seemed to have consigned to the grave—to have utterly extinguished the hopes of that hardy and indefatigable race of men who had covered the frontier at the time of the Indian invasions.

"This case was the last of that series of judicial constructions of the act of 1792, by which the claims of the warrant holder were sustained, in defiance of reiterated acts evincing the intention of the legislature and the wishes of the people. The decision of the supreme court of the United States in the case of the Holland Land Company claims, by placing the right of the warrant holder on a permanent foundation, by relieving him from the performance of the condition of settlement, on account of Indian hostilities, however manifestly inconsistent with the tenor of the law of 1792, had at least the advantage of at once ending the controversy between him and the actual settler, and putting an end to litigation; but the decision of the supreme court of Pennsylvania, which declared the rights of the warrantee forfeited, in the default of his entry and settlement within a period of two years from the treaty of Greenville, connected with a subsequent exposition of that act, virtually coun-

[Leasure v. Wilson.]

teracting and destroying the effect of the original decision, has retarded the settlement of the country, involved parties in vexatious litigation, and tended to the mutual impoverishment of the warrant holder and the settler.　When the principle once was established that the warrant holder forfeited his right in default of performing the condition of settlement, it seemed a necessary inference, obvious to common sense, conforming to the reason of men of ordinary capacity, that the lands so forfeited were open to settlement; it remained for judicial astuteness to discover that this was not the case; that, notwithstanding the forfeiture, the warrant holder still held his title secure against all but the commonwealth, that the entry of a settler, without a vacating warrant, was a trespass upon the lands of the warrantee; that as long as he continued there, his acts of cultivation and improvement were, *ipso facto*, a prevention, and all that he did enured to the benefit of the warrant holder; so that he who forfeited his right, in default of settlement, might regain it by the act of one who entered under colour of the forfeiture.　It will readily be perceived, that, whilst in form the rights of the warrantee not making a settlement were declared forfeited, in effect they were fully sustained.　In the investigation of the cases, it will be found that in every contest between the warrantee and the actual settler, the former has sustained his title, the latter has been evicted.　From a series of decisions, which have been accumulating for thirty years, all tending to establish the same principle of protection to the rights of the warrant holder, no judge can, at this period, dissent, without endangering the foundations of property, and involving the country in ruinous litigation.　Unfortunate as have been the results of these decisions to the actual settler, the duty of submission is the paramount duty of the citizen.　The excitements that have been caused by this controversy are nearly allayed, and he who would rouse them again, cannot be instigated by either patriotism or a reverence for the institutions of his country.　Whatever deference I may be disposed to pay to adjudications already made, I am by no means convinced that, where the rights of the actual settler can be sustained without conflicting with the decisions already made, there is any obligation imposed upon the inferior tribunals of the country to conform to that spirit in former adjudications which tends to give a paramount right to the warrant holder over the actual settler.

"If there remains one single solitary point still undecided, by which the settler may be saved in his rights, in part only, I deem it an incumbent duty to interfere for his preservation.　The point presented in the present case, is not entirely new to me.　I have mentioned, again and again, to our land lawyers, and intimated my determination, after mature deliberation on the subject, to give it the construction, and present it in the form in which it is now about to appear. It is the last hook which the actual settler has to hang a hope on; and, if ultimately found in his favour, will lay the basis of an edifice,

III.—W

[Leasure v. Wilson.]

in the erection of which, I, at least, am willing to risk my judicial reputation.

" The warrantee, in the present case, admits his default in making his settlement and improvement within the time required by the judicial construction of the act of 1792. The plaintiff entered under the impression that the land was forfeited, but without a vacating warrant. He made the improvements required by the act of 1792, and continued in possession until 1817, and complied in every particular with all that was necessary to acquire a title under the commonwealth.

" That the plaintiff's entry without a vacating warrant was a trespass; that, as regarded the warrantee, it was, *ipso facto*, a prevention; and, that all his acts enure to the benefit of the warrantee, so as to perfect the title of the latter, is beyond all question. Has he, then, shown a title in himself that enables him to recover of the warrant holder the warranted tract, or any part thereof?

" I allege that he has made out an indefeasible title to a portion of the tract. That the warrantee was bound to make a settlement, is clear; that, unless a settlement had been made, his land was forfeited, is unquestionable; that the entry of the settler enures to the benefit of the warrant holder, has been often adjudicated; that he that receives the benefit shall make the compensation, is a maxim in equity, applicable to the case before us, and conclusive upon the subject matter.

"What proportion, in such case, the settler shall receive, is a matter to be settled by the jury, from the particular facts of the case, and the customary agreements between warrantees and settlers. The compensation in these cases varies from one hundred to two hundred acres, quality and situation being taken into view.

" I am aware it will be alleged, that it appears an anomaly in law that a man should take title by a trespass. Equally is it an anomaly, that an individual should save a forfeiture on his part, by the trespass of another. Our whole land law is an anomaly. The case of Skeer *v.* Pearce, which decided that a vacating warrant must be taken out before entry by a settler on forfeited lands, when the issuing of warrants to any but an actual settler was prohibited, was an anomaly in judicial decisions. The raising of a trespass by legal implication on account of an entry without a vacating warrant on forfeited lands, is itself an anomaly, which it is fair to meet by anomalous construction.

" The position assumed by the court is distinctly this, that in all those cases where the warrant holder has failed to perform the condition of settlement, and an individual enters under the colour of forfeiture and fulfils the condition of settlement required by the act of 1792, clearing two acres for every hundred acres, erecting a house fit for the habitation of man, and continuing his residence for five years, such settler for ever acquires an indefeasible title to so much of the warranted tract entered upon, as, according to the custom of

[Leasure v. Wilson.]

the country, it is usual for other warrantees to give as a gratuity for making the settlement; that this is the common law in relation to titles north and west of the Alleghany and Conewango, derived under the act of the 3d of April 1792; that such position is sustained by the course of judicial decisions, and may be considered as the keystone which binds them together; and that those sections of the act of the 20th of March 1811, providing for the settlement of disputed titles north and west of the rivers Ohio, Alleghany and Conewango, hitherto deemed so exceptionable, are but declaratory of the common law.

"Before stating the necessary results of the decision, it may be well to advert to a principle no where perhaps laid down in the books, but which is too obvious to need illustration. It is this—that the doctrine of abandonment cannot prevail in any instance where the settlement has been completed; that under such circumstances, the actual settler stands in the same position as the warrantee; that he can only be evicted by the commonwealth for non payment of the purchase money; that no one can prescribe against him save he who has had twenty-one years of quiet, uninterrupted, adverse possession; and that a settlement, so completed, like livery of seisin, is notice of the settler's title to all the world.

"From the principles now laid down, the following deductions may be drawn.

"1. That where an actual settler upon lands forfeited for default of condition of settlement has been evicted by the warrantee, for want of a vacating warrant, he is entitled to recover the usual gratuity, provided he can show that he has completed the settlement condition of the act of 1792, and provided the warrantee has not had twenty-one years adverse possession.

"2. If, after having completed the settlement condition, the actual settler, under the impression that he has no title, has abandoned the tract, he is still entitled to recover the gratuity from the warrantee, upon proof of settlement, provided the warrantee has not been in actual possession for twenty-one years; the legal principle of abandonment not being applicable to the case.

"3. Where the settler has entered without a vacating warrant, and is still in possession, he is entitled to retain possession of the gratuity without warrant or survey, the warrant and survey of the warrantee enuring to his benefit.

"4. Where the actual settler has contracted to pay for the gratuity, such contract is in fraud of his right, and need not be performed.

"5. Where there has been an actual payment, in an action for money had and received to the use of the settler, it can be recovered, unless barred by the statute.

"6. Contracts between the warrantee and the actual settler, by which any portion of the gratuity is given up, unless protected by the act of the 20th of March 1811, cannot be enforced; but the settler takes the gratuity in the teeth of the contract.

[Leasure v. Wilson.]

"I am well aware that some of the positions here laid down, will not be considered as tenable by those who have been accustomed to apply legal maxims, indiscriminately to all cases, instead of suiting them to the state and condition of the country and the people. Where it is evident that the mass of society are not aware of their rights, and that they have sacrificed their titles to false principles and erroneously conceived doctrines, there is a paramount equity which transcends all maxims, and distributes equal justice. Such equity must be sustained by the courts, unless they would heedlessly sacrifice the rights of the many to the privileges of the few, under the pretence of adhering to maxims which it is their duty to repudiate as soon as they furnish a protection inconsistent with justice.

"That the principles here laid down may open the door to some litigation, is unquestionable; but that it could not be entirely closed without sacrificing the rights of the actual settler, is equally indisputable. That the popular construction of the act of 1792 was the correct one, and should have been maintained by the courts, no one, I believe, who investigates the subject, now entertains a doubt. As it is, the country has submitted in silence. Those who have toiled for twenty years, have seen the labours of a life swept from them by judicial construction. The sweat of the brow that has mingled with the soil; the exertions and labours of the hardy and industrious settler, have gone to swell the pocket, and increase the wealth of the warrant holder. Still there has been a submission that transcends all praise. One chance yet remains of rescuing some portion of the labours of the settler from the grasp of the warrant holder. Shall this chance be frittered away by judicial constructions, or shall the rights of the settler be sustained when it can be done without doing violence to former adjudications? This is a question, the ultimate decision of which rests with judges who deserve and have the confidence of the community."

The following errors were assigned.

1. The court erred in charging the jury that the plaintiff in this case was entitled to recover the usual gratuity of the land upon proving the settlement.

2. In charging the jury that an actual abandonment would not prevent the recovery of the plaintiff, and that the principle of abandonment did not apply where the settlement condition had been complied with.

3. In charging the jury that where a settler has entered without a vacating warrant, he is entitled to retain possession of the gratuity without warrant or survey, and that the title of the warrantee enured to his benefit.

4. In charging the jury that where an actual settler has entered into an agreement for the purchase of a part of the warrant, which is termed the gratuity by the court, such contract is in fraud of his right, and need not be performed; and that if money was paid on such contract, it could be recovered back by the settler; and that

[Leasure v. Wilson.]

contracts between the warrantee and the actual settler, by which any portion of what the court terms gratuity is given up, cannot be enforced.

5. The court erred in unsettling and overruling, by their charge, all the legal principles that have been ruled and decided by the supreme court for the last thirty years, relative to warrants and settlements north and west of the rivers Alleghany, Ohio and Conewango, and in instructing the jury that the solemn contracts of the parties, fairly entered into, were not binding on one of the parties to that contract.

*Fetterman,* with whom was *Evans,* for the plaintiffs in error.

What the court below terms the gratuity, was the portion of a tract of land sometimes given by the warrantee to an actual settler as a compensation for his labour and improvements. The plaintiff below had no vacating warrant, and claimed under the act of the 20th of March 1811, *5 Smith's L.* 198. The court admitted that possession without a vacating warrant was a trespass in the plaintiff, and that his acts, which were in prevention of the warrantee, enured to the warrantee's benefit. Skeer *v.* Pearce, *7 Serg. & Rawle* 303.

The court declined hearing further argument.

*Ayres,* for defendant in error.

The opinion of the Court was delivered by

GIBSON, C. J.—I should be sorry to have it supposed that this court had hesitated to mark its dissent from the doctrine predicated at the trial. A rule of equity was laid down to the jury which I am unable to comprehend: which the judge himself seemed to think would not be recognized by those who have drawn their notions of right and wrong from the principles and maxims of the law; and which, if it be a rule of equity at all, is justly described by him as one which transcends all maxims. The proposition, attempted to be established, presents the supposed equity as resting on the trespass and wrong of him who claims the benefit of it. According to the judicial construction of the act of the 3d of April 1792, established by a train of decisions from which it was admitted that no court could dissent without endangering the foundations of property, the land on which the plaintiff, or the person under whom he claims, entered in the character of a settler, was the lawful estate of another; yet though he had entered without or against the consent of the owner, it was thought that in analogy to the customary terms between warrant holders and persons employed by them to perform the condition of settlement, the law would imply a promise to give him part of the land. And for what? For nothing that I can perceive but to ease the proprietor of the burthen of ownership. But in the cases from which the analogy is attempted to be drawn, the "customary gratuity," as it is improperly called, is given by actual and

express contract, as the consideration for a settlement subsequently to be made in 'order to perfect the title; the consideration for the promise supposed to be implied here, is a voluntary, and it may be, unwelcome service. According to the construction put upon the act in question, in Huidekoper's Lessee *v.* Douglass, 3 *Cranch* 1, which in my individual judgment was the true one, the *condition* of settlement had been dispensed with by the continuance of Indian hostilities to the period of General Wayne's treaty; and the title of the warrantee, on the principle of that decision, was perfect already. But granting that by the decisions of our own court, which furnish the rule by which we are to be governed, the condition of settlement remained to be performed at the peace : yet a settler by contract would be bound to surrender the part reserved by the warrantee at the completion of the settlement and residence; for it would be unjust to allow him the benefit of the contract after he had repudiated it by setting up an independent title in defiance of it, for the same reason that a lessee cannot be allowed to resume the character of a tenant and the advantages incident to it after having set up a title independent of the lease. But it would be going immeasurably further, to *create* a contract in favour of a settler driven to the verge of a defence on an adverse title, when he would have forfeited it by resistance had a contract in fact existed. The injustice of implying a contract for a part, from an adverse possession of the whole, is so glaring of itself, as to render any attempt to illustrate it not only unnecessary but futile. And why should we force such a principle into our jurisprudence, to the disruption of the best established rules of property; or rather sustain it as a newly discovered common law principle of local origin ? Nothing is alleged in support of it but the supposed hardship of " false principles and erroneously conceived doctrines" adopted by the tribunals in settling the construction of the act in question. The time has been when the imputation of vicious principles or doctrines to the judges of the supreme court of the United States, or of the supreme court of Pennsylvania, would have been thought a bold one. With one illustrious exception they have passed away ; but they have left us a legacy in the results of their judicial labours by which it is to be hoped that posterity will have the wisdom to profit. It is not too much to say that our civil liberties can be preserved but on the foundations laid by them for the security of person and property; and that the permanence of our political liberty will be greatly influenced by the degree of our adherence to the principles of the constitution as settled by the federal judiciary. For my own part I am convinced, that had the decision of Huidekoper *v.* Douglass preceded the decision of our own courts, it would have put an end to the contest, and given, not only to the country but to the losing parties, the benefit resulting from security of title and repose. Even on the principles established by our own courts, a settler without a vacating warrant is a trespasser, and nothing is left him for the pretence of an equity, but the merit of personal exposure

[Leasure v. Wilson.]

to danger in establishing a barrier to the incursions of a barbarous enemy, and the hardship of losing the fruits of his labour for having misconceived the nature and solidity of the adverse title. It is obvious that these two equities, so to call them, cannot stand together. A settler who entered on warranted land before the treaty of Fort Grenville, was an open and notorious intruder, because the title of the warrantee was protected without settlement by the special provisions of the law, while there was a reasonable apprehension of danger ; and if he entered after the general pacification, he had no merit from exposure to boast of. Even were that otherwise, his merit for a service to the public would be a subject of compensation out of the public purse, rather than out of the pocket of an individual who had not been particularly benefited by it. For myself I never have been able to perceive any peculiar merit in the settler on this ground as regards the title of the warrantee. On the other hand, if he entered at the expiration of two years from General Wayne's treaty, what equity could he derive from having mistaken the nature of the title, or from the hardship of having the question decided against him ? A desire to possess the property of another because we have expended our money or labour in improving it, is natural, but not the less unfounded in reason or justice. Indeed the very distinctions of property itself, are not founded so much on justice as necessity ; for without security for the enjoyment of the produce of our labour there would be no incitements to industry, and society could not exist. As in the case of every other enterprise, the entry of a settler on appropriated land is dictated by his calculation of the chances of eventual loss or gain. And if the event turn out unpropitiously for him, who is to suffer for it ? Certainly not the warrantee, who was not the cause of the mistake, and did no act to induce the expenditure of labour which is the consequence of it. Such a case is within a maxim of universal law, resting on reason and the purest ethics, that a loss which is inevitable shall fall on him whose act produced it. But is the case of the warrantee destitute of merit ? The object of the state in offering her vacant lands for sale on the terms of the act of 1792, was not only to settle the country, but replenish the treasury ; and these were equally meritorious in the sight of the legislature. Had they not been so, the lands north and west of the Alleghany river, instead of being exposed to sale for cash, with a condition of subsequent settlement superadded, would have been offered at a credit, and on terms of settlement in the first instance. I am therefore unable to perceive an equity in either class so omnipotent as to uproot the settled foundations of property. The real hardship of which the settlers have reason to complain, has been produced by an injudicious disposition to maintain their titles against the true owners and the true construction of the law. Had the decision in Huidekoper v. Douglass been established as the rule of the state courts, the settlers would have had the land long since at a reasonable price, and for a tithe of the sum unavailingly spent by them in

a harassing contest; and the country, instead of being shunned by the tide of emigration that set in towards the west, would have been densely populated, and as highly cultivated as the beautiful region that adjoins it in a sister state. Concurring in opinion with the judge, that the excitements caused by this controversy are nearly allayed, and heartily responding to his sentiment that he who would rouse them again cannot be instigated by either patriotism or a reverence for the institutions of the country, we esteem it a duty not to stimulate the resentments of the disappointed, or encourage unavailing hopes which would blow them again into a flame. We are of opinion that there is no implication of a contract or an equity arising out of the circumstances disclosed in the charge, which could in any wise entitle the plaintiff to recover.

Judgment reversed, and a *venire de novo* awarded.